UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____
CENTRAL NEW YORK FAIR BUSINESS ASSOCIATION,
CITIZENS EQUAL RIGHTS ALLIANCE, DAVID R.
TOWNSEND, New York State Assemblyman, MICHAEL J.
HENNESSY, Oneida County Legislator, D. CHAD DAVIS, Oneida
County Legislator, and MELVIN L. PHILLIPS,

|  |  |  |
|---|---|---|
| | Plaintiffs, | COMPLAINT |
| v. | | Civil Action No. |

DIRK KEMPTHORNE, individually and in his official
capacity as Secretary of the U.S. Department of the Interior,
P. LYNN SCARLETT, in her official capacity as Deputy
Secretary of the U.S Department of Interior, JAMES E. CASON,
in his official capacity as the Associate Deputy Secretary of the
Interior; FRANKLIN KEEL, the Regional Director for the Eastern
Regional Office of the Bureau of Indian Affairs; and JAMES T.
KARDATZKE, Eastern Regional Environmental Scientist; and
ARTHUR RAYMOND HALBRITTER, as a real party in interest
as the Federally Recognized Leader of the Oneida Indian Nation.

        Defendants.
_____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## AND CIVIL RIGHTS VIOLATIONS

## NATURE OF THE ACTION

1.  Plaintiffs are seeking to reverse an unlawful final Record of Decision ("ROD") of

the Bureau of Indian Affairs ("BIA") through the Secretary of Department of the Interior

("DOI"), issued on May 20, 2008 and published in the Federal Register on May 23, 2008 (73

Fed. Reg. 30144, May 23, 2008), which seeks to place 13,003.89 acres of land in Central New

York and owned in fee simple by the Oneida Indian Nation of New York ("OIN") into federal

trust on behalf of the OIN pursuant to the Indian Reorganization Act of 1934 ("IRA") 25 U.S.C.
§465, et seq.  This action by the DOI is a final agency action pursuant to 25 C.F.R. §2.6 and 5
U.S.C. §704.  This action is for declaratory and injunctive relief pursuant to the Declaratory
Judgment Act, 28 U.S.C. §§2201 and 2202 et seq (the "DJA").

    2.   Plaintiffs are seeking to overturn the ROD and to obtain from the court a
permanent injunction against the taking of any land whatsoever in New York State pursuant to
the fee to trust provisions of the IRA as is being wrongly attempted in this case by the DOI.

    3.   Plaintiffs assert that the ROD is contrary to existing law and that its
implementation would cause permanent and irreparable harm to the environment, including the
human environment as required under the National Environment Policy Act ("NEPA), 42 U.S.C.
§ 4321 et seq; would create a jurisdictional nightmare for the state and local governments, and
would aggravate the ongoing economic destruction of the state and local economies due to the
illegal operation on the land in question.

    4.   Plaintiffs reject the premise that placing land into trust is a viable option under 25
U.S.C. § 465 as authorized by Congress.  Notwithstanding the fact that plaintiff's also allege that
the DOI has failed to engage in an unbiased and fair analysis of this fee trust to application
which requires full compliance with the regulations governing fee to trust that would provide
administrative safeguards to protect the diverse interests of the non-Indian community amidst
this patchwork of parcels that have been selected by the DOI for trust status.  The DOI has also
failed to apply a fair and unbiased analysis of the jurisdictional and human impacts as required
by this agency action under the National Environmental Policy Act ("NEPA"), 42 USC § 4321 et
seq.

    5.   Plaintiffs assert that based on the plain reading of the United States Constitution,

the New York State Constitution and the recent decisions of *City of Sherrill v. Oneida Indian Nation*, 544 U. S. 197 (2005) and *Cayuga Indian Nation v. Pataki*, 413 F. 3d 266 (2nd Cir. 2005), *cert. denied,* 2006 U.S. LEXIS 3949 (U.S., May 15, 2006), that the defendants have no authority to create federal public domain land or federal Indian land in the State of New York, an original Colony and sovereign state, which has retained its pre-emptive rights to all lands within its exterior boundaries.  Indeed, the cloud known to be aboriginal Indian Title was ceded "permanently and forever" to the sovereign state of New York in the 1788 Treaty of Fort Schuyler.  It is critically important to note that the federal government was not extant as a sovereign in 1788.  No lands in New York have ever been placed in federal trust status pursuant to 25 U.S.C. § 465.

6.     Plaintiffs assert that the analysis in *Sherrill* actually prohibits the federal defendants from accepting any lands into federal trust status pursuant to 25 U.S.C.§ 465.

7.     In *Sherrill*, the United State Supreme Court held, "the Tribe cannot unilaterally revive its ancient sovereignty, in whole or in part, over the parcels at issue.  The Oneidas long ago relinquished the reins of government and cannot regain them through open-market purchases from current titleholders."  *Sherrill* at 198.  The court also recognized that there is no federal common law right in an Indian tribe or the United States to:

> "Argue that because the Court in Oneida II recognized the Oneida's aboriginal title to their ancient reservation land and because the Tribe has now acquired specific parcels involved in this suit in the open market, it has unified fee and aboriginal title and may now assert sovereign dominion over the parcels," *Sherrill* at 213.

3

8.   The regulations promulgated by the Secretary on May 19, 2008, like the preceding regulations, are unconstitutional when applied to the unique situation presented in New York and the State's history of dealing with its Indians tribes.  25 U.S. C. § 2719 Part 292.

9.   The attempt by the DOI to place the aforesaid lands into trust and any contemplated future lands is nothing more than a back door attempt to apply the unification theory through the executive bureaucracy in clear contradiction of the holding of the *Sherrill* case.  Likewise, this ROD represents an end run around *Sherrill* for the express purpose of avoiding the taxation and regulatory powers of the state and local governments, which have been and continue to be violated by OIN.

10.   Plaintiffs further assert that the enabling legislation for the IRA of 1934 did not contemplate its application east of the Mississippi River.  Rather, the Congressional intent was only to apply the IRA to federal public domain lands acquired after the United States was formed.  The ROD is an overreach of the power designated to the Secretary under the IRA.  In point of fact, the Secretary is acting outside of his discretion and jurisdiction because the IRA is a public lands statute.

11.   The ROD also violates the 10th Amendment to the U.S. Constitution which states, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or the people."

12.   The ROD presumes that the operation at Turning Stone Casino is legal.  Both state and federal court decisions have affirmatively ruled that the Class III gaming operation is illegal and in violation of Article I, § 9 of the New York State Constitution and Article 25 of New York's Penal Law.

13.   The ROD is: arbitrary, capricious, an abuse of discretion, or otherwise not in

4

accordance with law; contrary to the constitutional right, power and privilege or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; without observance of procedure required by law and all other relevant provisions of 5 USC § 706 of the Administrative Procedures Act ("APA").  The ROD is also in violation of 42 U.S.C. §4321, et seq, and in violation of the relevant regulations governing land into trust under 25 CFR 151 et seq.  Accordingly, the ROD is unlawful; and by virtue of the same, this action on the part of the agency must be set aside, as provided for under 5 U.S.C.§ 706.

## JURISDICTION AND VENUE

14.    The jurisdiction of this court is invoked pursuant to 28 U.S.C. §§1331, 5 U.S.C. §500 et seq., 5 U.S.C. 701-706 et seq. and 28 U.S.C. §§ 2201 and 2202; the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 et seq; 42 U.S.C. §§ 1981, 1983, 1985; 42 U.S.C §1343 et seq.  The United States waives sovereign immunity from suit under 5 U.S.C. §702 and 28 U.S.C.§2209(a).  There now exists a controversy between the parties that evokes the jurisdiction of this court as the decision to take the aforesaid land into trust constitutes a final decision of the Secretary of the Interior that is subject to review by this court.

15.    The notice of the ROD was published in 73 F.R. 30144-30146 on May 23, 2008. Pursuant to 25 C.F.R. § 151.12(b) this notice is appealable in 30 days before the Secretary takes the land into trust.  The ROD does not comply with 25 C.F.R. § 2.6 (c) that requires the signature of the Assistant Secretary of Indian Affairs to be a final decision of the DOI.  Plaintiffs filed notice of appeal to the Interior Board of Indian Appeals ("IBIA") on June 10, 2008, raising as the first ambiguity between the ROD stating it has a final decision and 25 C.F.R. § 2.6 (c).  On June 13, 2008, the IBIA docketed the appeal as IBIA 08-95-A and issued an Order dismissing the appeal for lack of jurisdiction.  The IBIA found that "No regulation or delegation grants the

Board the authority to review a decision by the Deputy Secretary or the Associate Deputy Secretary." "The Board's jurisdiction is limited to the authority vested in it by regulation or otherwise delegated to it by the Secretary of Interior.  See 43 C.F.R. § 4.1 (b)(2)." Pursuant to 25 C.F.R. § 2.6 and § 4.315 (c)the IBIA order is a final agency action amenable to judicial review. No further federal administrative appeal is necessary.  All federal administrative remedies are exhausted and required by 5 U.S.C. §704 for judicial review.  The United States has waived its sovereign immunity from suit under 5 U.S.C. § 702 and 28 U.S.C. § 2209 (a).

16.    Venue is proper in this court under 28 U.S.C. §§ 1391 (b)(2) and 1391 (e), 5 U.S.C.§703.  The property which is the subject of this fee to trust decision is located in this judicial district and the plaintiff's reside in the district and/or are lawfully elected to serve the residents of these districts.

## PARTIES

17.   Plaintiff, Central New York Fair Business Association ("CNYFBA"), is a non-profit corporation incorporated under the laws of the State of New York and has members who own homes and operate businesses in and around the areas that are included in the DOI's ROD.

18.   Plaintiff, Citizens Equal Rights Alliance ("CERA"), is a non-profit 501 (c)(4) corporation incorporated in South Dakota.  CERA has members in 22 states including members throughout New York State. Three CERA board members own property and reside in Madison and Oneida Counties near the parcels to be taken into trust by the ROD.

19.    Plaintiff, David R. Townsend, is a duly elected member of the New York State Assembly who resides near parcels to be taken into trust and further, represents thousands of other residents who also reside near the lands to be taken into trust by the ROD.

20.    Plaintiff, Michael J. Hennessy, is an Oneida County Legislator for the 2nd District

and resides near parcels to be taken into trust and represents thousands of residents who also reside near the lands to be taken into trust by the ROD.

21.    Plaintiff, D. Chad Davis, is an Oneida County Legislator for the 18th District and resides near parcels to be taken into trust and represents thousands of residents who also reside near the lands to be taken into trust by the ROD.

22.    Plaintiff, Melvin L. Phillips, is a full-blooded Oneida Indian residing in the Town of Vernon, Oneida County on untaxed state land where the Indian title has never been extinguished.  The Phillips family and other similarly situated Oneidas and their ancesters have lived on the land continuously in compliance with the use-right "reservation" created for them in the Treaty of 1788.  Plaintiff Phillips is a direct descendant of the "Home Party" of Oneidas which were given rights under the June 25, 1842 State Treaty with the Orchard Party.  The Orchard Party and its descendants in the Home Party were given a use right to said state lands as outlined in the June 1842 Treaty.  The Home Party members chose not to leave the State of New York and are listed as a recognized band of Oneida tribe in the Treaty of Buffalo Creek in 1838 (Article XIII).  Plaintiff Phillips asserts that the OIN federal fee to trust application will destroy or impair the more than 200 year old trust relationship that has existed between his family and other remaining Oneida Indian residents of State land with the State of New York which promised to protect his rights under the aforesaid treaties.

23.    The Defendants are the Secretary of the Interior, Dirk Kempthorne; the Deputy Secretary of the Interior, P. Lynn Scarlett; the Associate Deputy Secretary of the Department of the Interior, James E. Cason; Franklin Keel, Eastern Regional Director of the Bureau of Indian Affairs; Arthur Raymond Halbritter, as a real party in interest as the federally recognized leader of the Oneida Indian Nation of New York. All, except the real party in interest Halbritter, are

7

being sued in their official and individual capacity and are named defendants as a result of the actions and decisions of the DOI for which they bear the responsibility.

## STATEMENT OF FACTS

24.   The Oneida Indian Nation ("OIN"), an actual party to the *Sherrill* case, is a direct descendant of "the Six Nations of the Iroquois."  Id. at 230.

25.   At the birth of the United States, the Oneida Nation's aboriginal homeland comprised some six million acres in what is now central New York.  *Ibid.; Oneida Indian Nation of N. Y.* v. *County of Oneida,* 414 U.S. 661, (1974) *(Oneida I)*.

26.   As set forth in paragraph one of the 1788 Treaty of Fort Schuyler, for payments in money and kind, the Oneidas ceded to New York "all their lands." Of the vast area conveyed, "[t]he Oneidas retained a reservation of about 300,000 acres," *Oneida II*, 470 U.S., at 231. "for their own use and cultivation,"  Hereinafter, a  "use right" was conveyed, not a federal reservation of public domain lands as defined in the western states.  Paragraph one of the 1788 Treaty of Fort Schuyler ceded all of the Oneida lands to the State of New York.  Paragraph two then established a state use right reservation for the cultivation, hunting and occupation of the Oneidas allowing them to rent the land for periods of not more than 20 years.   This paragraph also reserved to the Oneidas the right of free passage on the waterways and the use of the Oneidas carrying place at Fort Stanwix.

27.   The Federal Government initially pursued a policy protective of the New York Indians, undertaking to secure the Tribes' rights to reserved lands. See *Oneida II*, 470 U.S., 470 at 231-232; *Oneida I*, 414 U.S., at 667; F. Cohen, Handbook of Federal Indian Law 418-419 (1942 ed.); F. Cohen, Handbook of Federal Indian Law 73-74 (1982 ed.) (hereinafter Handbook).

28.   In 1790, Congress passed the first Indian Trade and Intercourse Act, commonly known as the Nonintercourse Act. Act of July 22, 1790, ch. 33, 1 Stat. 137.  The Non-Intercourse Act was renewed periodically.  In 1793, Congress specifically removed language that gave the Act applicability to, "any state, whether having pre-emption to such lands or not." Act of March 2, 1793, §8, 1 Stat. 329, 330.   This critical deletion in 1793 arguably allowed the states, henceforth to purchase Indian lands without federal interference or superintendence.

29.   In 1794, in further pursuit of its protective policy, the United States entered into the Treaty of Canandaigua with the Six (Iroquois) Nations.  Act of Nov. 11, 1794, 7 Stat. 44.  That treaty both "acknowledge[d]" the Oneida Reservation as established by the Treaty of Fort Schuyler and guaranteed the Oneidas' "free use and enjoyment" of the reserved territory.  *Id.*, at 45, Art. II.   The federal treaty also confirmed the right of free passage on the waterways reserved to the Oneidas.  The Oneidas in turn agreed they would "never claim any other lands within the boundaries of the United States." *Id.,* at 45, Art. IV.

30.   In the 1794 Treaty of Canandaigua, the Federal Government acknowledged the state reservation.  Article 2 states,

> "The United States acknowledge the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the state of New York, and called their reservations, to be their property; and the United States will never claim the same, nor disturb them or wither of the Six Nations, nor their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but of said reservations shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase."  Treaty of 1794.

31.   New York State nonetheless continued to purchase reservation land from the Oneidas.  The Washington administration objected to New York's 1795 negotiations to buy 100,000 acres of the Oneidas' Reservation without federal supervision.   Colonel Chapin's July

31, 1795 letter to Timothy Pickering, having been instructed by President Washington not to try to undo these transactions if they had been completed, Pickering felt obliged to pass this word along.  See Tribes & The American Constitution, Page 131, by Francis G. Hutchins.  Later administrations, however, "[made not] even a pretense of interfer[ing] with [the] State's attempts to negotiate treaties [with the Oneidas] for land cessions." *Oneida Nation of N. Y.* v. *United States*, 43 Ind. Cl. Comm'n 373, 385 (1978).

32.   The Federal Government's policy soon veered away from protection of New York and other east coast Indian concerns.  As evidenced by the 1830 Removal Act, the United States pursued a policy in contradiction to the 1794 Treaty of Canandaigua.

33.   As recounted by the Indian Claims Commission in 1978, early 19th-century federal Indian agents in New York State did not simply fail to check New York's land purchases, they "took an active role ... in encouraging the removal of the Oneidas ... to the west." *Oneida Nation of N. Y.*, 43 Ind. Cl. Comm'n, at 390; see *id.*, at 391 (noting that some federal agents were "deeply involved" in "plans ... to bring about removal of the [Oneidas]" and in the State's acquisition of Oneida land).

34.   Beginning in 1817, the Federal Government accelerated its efforts to remove Indian tribes from their east coast homelands. F. Cohen Handbook 78-79, and n. 142.  Pressured by the removal policy to leave their ancestral lands in New York, some 150 Oneidas, by 1825, had moved to Wisconsin.

35.   In furtherance of the Removal Act policy, in 1838, the Oneidas and the United States entered into the Treaty of Buffalo Creek, which envisioned removal of all remaining New York Indians to Kansas.  Act of Jan. 15, 1838, 7 Stat. 550.  The United States eventually abandoned its efforts to remove the New York Indians to Kansas.  In 1860, the Federal Government restored

the Kansas lands to the public domain, and sold them thereafter.  *New York Indians*, 170 U.S., at 24, 28-29, 31.

36.   The Indians who stayed on in New York after the proclamation of the Buffalo Creek Treaty continued to diminish in number and, during the 1840's, sold most of their remaining lands to the State.  *New York Indians* v. *United States*, 40 Ct. Cl. 448, 458, 469-471 (1905).  The sale of lands to the State of New York continued through the 1890's, all six of the New York Tribes retaining only small state land reservations.

37.   The consistent policy of the United States was to allow the State of New York complete civil and criminal jurisdiction over the state land reservations of the New York Indian tribes.  *See United States ex rel Kennedy v. Tyler,* 269 U.S. 13 (1925);   25 U.S.C. §§ 233, 232.

38.   The IRA was enacted in 1934 representing a change in the Federal Indian Policy.

39.   The purpose of the IRA was to end the allotment of Indian lands pursuant to the policy of the Dawes Act of 1887, 25 U.S.C. §331 et seq. ("The policy of allotment came to an abrupt end in 1934 with the passage in 1934 of the [IRA]"); F.S. Cohen, Handbook of Indian Law (1941) at 84.

40.   The federal policy of allotment under the Dawes Act has never been applicable to New York or its lands.

41.   The questions as to whether the Oneidas are a recognized tribe under the IRA is still uncertain.  In a case pending before the Supreme Court, the question of whether or not the Secretary has the power to take land into trust on behalf of a tribe not recognized in 1934 will be considered.  *Carcieri v. Kempthorne* (U.S. Supreme Court, No. 07-526)

42.   The Indian Gaming Regulatory Act ("IGRA") imposes even greater scrutiny on the Secretary for taking land into trust when the land is used for gaming. 25 U.S.C. § 2719

11

(b)(1)(a);  *Artichoke Joe's California Grand Casino v. Norton*, 278 F.Supp. 2d 1174, 1883 (E.D. Cal. 2003).

43.   Governor Mario Cuomo signed a tribal-state compact with the OIN in 1993.  It was later determined by the New York Court of Appeals that the tribal state compact was invalid because it violated the doctrine of separation of powers and it was not approved by the state legislature. (*Peterman v. Pataki*, 798 N.Y.S. 2d 347, 4 Misc. 3d 1028A, 2004 WL 2222278 (N.Y. Sup. Ct. 2004) affirmed *Peterman v. Pataki*, 21 AD3d 1388, 801 NYS2d 212,2005 N.Y. App. Div. LEXIS 10373 (N.Y. App. Div. 4th Dep't, 2005) Appeal denied by *Peterman v. Pataki*, 24 AD3d 1328,806 NYS2d 442, 2005 N.Y. App. Div. LEXIS 14706 (N.Y. App. Div. 4th Dep't, 2005) Appeal denied by *Peterman v. Pataki*, 6 NY3d 713, 849 NE2d 971, 816 NYS2d 748, 2006 N.Y. LEXIS 1271 (2006) US Supreme Court certiorari denied by *Oneida Indian Nation v. Peterman*, 127 S Ct 730,166 L Ed 2d 562, 2006 U.S. LEXIS 9260 (U.S., Dec. 4, 2006)).

44.   It is a violation of federal law for a tribe to engage in Class III gaming that does not comply with IGRA.  18 U.S.C. § § 1166-1168.  The tribe is operating on land that is ineligible under IGRA and not pursuant to a valid Tribal-State Compact.

**IRA, Property Clause and Enclave Clause Analysis**

45.   The *Sherrill* Court expressly cites to the 2004 regulations implementing § 465 as "sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory.*"  Sherrill* at 220-1.  The Supreme Court decision did not analyze or discuss the applicability of 25 U.S.C. §465 to New York.  These jurisdictional concerns are not addressed by the DOI's ROD.

46.   Before approving an acquisition, the Secretary must consider, among other things, the tribe's need for additional land; the purposes for which the land will be used; the impact on

the State and its political subdivisions resulting from the removal of the land from the tax rolls; and jurisdictional problems and potential conflicts of land use which may arise.  Citing 25 C.F.R.§ 151.10 (2004).  *Sherrill* at 221.

47.   The ROD does not adequately address the OIN application in terms of the factors deemed part of the "justifiable expectations" of the local non-Indian residents or state and local governments identified in the *Sherrill* decision as disruptive.

48.   Unlike most fee to trust applications that are for small parcels of land to be added to an existing federal Indian reservation, the OIN fee to trust application is for enormous amounts of lands that have been under continual state jurisdiction for almost two hundred years. To now place these lands into federal trust status, is essentially creating a federal Indian reservation in New York where none have ever existed.

49.   All reserved lands for Indian Tribes in New York were state reservations of Indian land that created only **use right reservations**. (Emphasis supplied.) Today, there are tribes in New York with "federal recognition," but none occupy land that was once federal public domain lands.

50.   The *Cayuga* decision expanded upon the *Sherrill* ruling to include all types of possessory land claims as being subject to the equitable considerations enumerated in *Sherrill.*

51.   The United States Department of the Interior and the Department of Justice have been thwarted in their attempts to restore lands to the New York Indian tribes in land claim cases that have been litigated for more than 30 years and have cost the taxpayers of New York millions of dollars to defend.

52.   The Secretary of the Interior denied the fee to trust applications of the Seneca-Cayuga of Oklahoma and the St. Regis Mohawk on January 4, 2008.  The Cayuga claims are still

pending.

53.     The IRA requires the State of New York to consent to the cession of the property that is being taken by the Secretary.  In fact, under Article 2, Section 10 of State law, the Governor of the State of New York has an affirmative obligation to defend the state against, "any claim inconsistent with its sovereignty and jurisdiction."

54.     The State of New York has not surrendered its sovereignty or consented to the trust taking by the Defendants.  However, the State wrongly concludes in its complaint that the casino footprint is eligible to be placed into federal trust status.

### FIRST CLAIM FOR RELIEF

**The Indian Reorganization Act of 1934 ("IRA")
as applied in New York is a violation of 5 U.S.C. § 706**

55.     Plaintiffs repeat and reallege paragraphs "1" through "54 ", inclusive, of this Complaint as if fully set forth herein.

56.     The IRA is a federal public domain statute, that only applies to federal lands.  New York is an original colony where there are currently no federally owned public lands outside of defense installation and post offices.

57.    The Indian Reorganization Act (IRA) requires in 25 USC § 465, that: "Title to any lands or rights acquired pursuant to this Act ... shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation."

58.    The plain meaning of Section 5 of the IRA was that only the acquisition methods, as enacted by Congress, were delegated to the Secretary of the Interior to accept lands into federal trust status for an Indian tribe.

14

59.   Until 1978, all lands restored to tribal sovereignty under the IRA were acquired by direct appropriation of Congress under the Property Clause, Art. IV, Sec. 3, Cl. 2.  However, interestingly, the federal government has admitted in legal briefs that neither the  Property Clause, nor the Enclave Clauses apply to Federal Indian Land . *CNYFBA et al v. Kempthorne*, 2007 U.S.Dist. LEXIS 40046 (6:06-cv-1501), Brief of Department of Justice, page 22, filed April 9, 2007.  Since there is no Federal Indian Land in New York, the Secretary has no power to take the land using the Property or the Enclave Clause.

60.   Section 5 of the IRA is expressly limited to Congressional appropriations of no more than two million dollars per year.  The value of the lands in the instant case alone exceed two million dollars per year.

61.   The IRA designates different requirements in Section 5 for acquired additional lands from Section 3 for "restored" lands either surplused or otherwise disestablished from a federal Indian reservation of federal public land reserved by treaty, executive order or act of Congress.

62.    Restored lands pursuant to Section 3 regained their tribal territorial status as tribal land if it was deemed by the Secretary of the Interior to be in "the public interest."

63.   As intended by Congress in passing the IRA, subjecting the purchase of lands to be restored to Indian Tribes to express Congressional appropriations was and is an express limitation on the discretion of the Secretary of the Interior required by the Property Clause that vests sole discretion in the management of property and acquisition of territory in the Congress.

64.   The only other clause of the Constitution of the United States that allows the federal government to purchase land is the Enclave Clause, Art. I Sec. 8, Cl. 17.

65.   Lands purchased under the Enclave Clause requires the consent of the Governor of

the State for federal jurisdiction to vest.  However, as admitted by the government and cited

above, neither the Enclave clause nor the Property clause apply in New York.

66.   No other clauses exist in the Constitution for the federal government to acquire

ownership of land.

67.   Neither Section 5 of the IRA or 25 U.S.C. § 465 have been amended by Congress

since 1934.  Only two minor amendments for specific Indian tribes have been added.

68.   As currently defined, the federal regulation that asserts the discretion of the Secretary

of the Interior to accept lands owned in fee by the Tribe into federal trust status is 25 C.F.R.§

151.3:

>  "Land acquisition policy.  Land not held in trust or restricted status may only be acquired
> for an individual Indian or a tribe in trust status when such acquisition is authorized by an
> act of Congress.  No acquisition of land in trust status, shall be valid unless the acquisition
> is approved by the Secretary.  (A) Subject to the provisions contained in the acts of
> Congress which authorize land acquisition, land may be acquired for a tribe in trust status:
> (1) When the property is located within the exterior boundaries of the tribe's reservation
> or adjacent thereto, or within a tribal consolidation area; or (2) When the tribe already
> owns an interest in the land; or (3) When the Secretary determines that the acquisition of
> the land is necessary to facilitate tribal self-determination, economic development, or
> Indian housing."

69.   Expanding the methods by which lands can be conveyed into trust status violates the

plain meaning of the appropriative restriction of Section 5 of the IRA.

70.   Only Congress can extend the federal Indian trust to include lands purchased by or

donated to an Indian tribe.

71.   Other acts of Congress including 46 Stat. 1106, as amended by 82 Stat. 171,

codified as 25 U.S.C. § 451 but not adopted as part of the Johnson-O'Malley Act or as part of the

Indian Self-Determination and Education Assistance Act, cannot be interpreted by the Secretary

of the Interior as authorizing an expansion of the Indian trust or his authority to accept donated or

16

transferred Indian lands into trust status pursuant to 25 U.S.C. § 465.

72.     Without the appropriative restriction of Section 5 of the IRA, the asserted authority of the Secretary of the Interior to accept lands into federal trust status as currently defined in 25 C.F.R. § 151.3 is unlimited.

73.   Lands taken into federal trust that are not purchased pursuant to Section 5 of the IRA cannot restore tribal sovereignty unless the fee title to the lands and aboriginal title are assumed to become unified, which was rejected as in the *Sherrill* decision.

74.   In fact, without a direct act of Congress to appropriate land for a tribe and remove it from state jurisdiction, the Secretary has no authority under the IRA to remove lands from the State or local tax base. *See Hynes v. Grimes Packing Co*., 337 U.S. 86, 101-06  (1949), *See also Mescalero Apache Tribe v. Jones*,  411 U.S. 145  (1973).

75.   The assumption that federal Indian common law authorized the Secretary of the Interior to accept lands into trust status was in reality, unilaterally promulgated by the Secretary of the Interior, without the proper authorization from Congress.  25 C.F.R. §120a (1980).

76.     In fact, these unilaterally expanded regulations that included accepting fee land of the tribes into federal trust status, were declared unconstitutional in *South Dakota v. Babbitt*, 519 U.S. 919 (1996).

77.   The new regulations for 25 U.S.C. § 465 were promulgated in 2004 and revised again and published on May 19, 2008.

78.   The *Sherrill* decision cites explicitly to 25 U.S.C.§ 465 as "Recognizing these practical concerns, Congress has provided a mechanism for the acquisition of lands for tribal communities that takes account of the interests of others with stake in the area's governance and well-being."  *Sherrill* at 220.

17

79.    The *Sherrill* Court expressly cites to the 2004 regulations implementing § 465 as "sensitive to the complex interjurisdictional concerns that arise when a tribe seeks to regain sovereign control over territory." *Sherrill* at 220-1.  These jurisdictional concerns are not addressed by the defendant's limited FEIS, nor are they addressed in the ROD.

80.    Before approving an acquisition, the Secretary must consider, among other things, the tribe's need for additional land; the purposes for which the land will be used; the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls; and jurisdictional problems and potential conflicts of land use which may arise.  Citing 25 C.F.R.§ 151.10 (2004).  *Sherrill* at 221.

81.    The ROD, in Section 1.3 states, "the purpose of the Proposed Action is to help address the Nation's need for cultural and social preservation and expression, political self-determination, self-sufficiency and economic growth by preserving a tribal land base and homeland."

82.    Defendant's assert the authority to do the above in Section 1.4 of the ROD pursuant to 25 U.S.C. § 465 and the 25 C.F.R. regulations.

83.    In effect, the defendants are asserting the authority to create a federal Indian reservation in New York where no federal Indian reservation has ever existed.

84.    The President is expressly prohibited from making any more Indian reservations. See Indian Appropriations Act of 1919, Section 27, 41 Stat. 3, 34.

85.    Congress reserved to itself the exclusive right to make a new Indian reservation, but only on lands under federal superintendence.

86.    The interpretation of 25 U.S.C. § 465 by the Secretary contained in the ROD allowing him to carve out OIN land from the jurisdiction of the State of New York is arbitrary,

18

capricious and not in accordance with law, for asserting the right to create federal Indian land for the Oneidas where it never existed.

87.   Attempting to create federal Indian land for the first time in New York State violates the separation of powers.  By subverting the exclusive authority of the Congress pursuant to the Property Clause and by subverting the sovereign authority of the State of New York by attempting to establish sovereign rights in the Oneidas that were not reserved to them before statehood, separation of powers is violated.  This would clearly disrupt the settled governance of New York more than 200 years after the Oneidas conceded all of their sovereignty in the Treaty of Fort Stanwix (Fort Schuyler).

88.   Section 18 states, "This Act shall apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application."  The OIN voted in compliance with the statute to reject the application of the IRA.

89.   As indicated above, the IRA was implemented to remedy the allotment policy under the Dawes Act.  There were no allotments made in New York under the Dawes Act and Congress did not intend for the IRA to apply to lands that were not subject to the Dawes Act.

90.   There is no evidence to support the fact that OIN was a recognized tribe nor under federal jurisdiction at the time of the enactment of the IRA in 1934.   Further, the OIN voted to opt out of the application of the IRA as indicated above.

91.   25 C.F.R. §151.3 requires that land may be taken into trust only when the acquisition is authorized by Congress.

92.   There is no Act, statute or regulation in existence that authorizes the Secretary to take the land that is the subject of the ROD into trust on behalf of the OIN.

19

93.   Therefore, the actions of the defendants are in excess of their authority, have no basis in law and must be enjoined by this court as Plaintiffs have no other adequate remedy at law.

## SECOND CLAIM FOR RELIEF

### The Secretary's Misapplication of  25 U.S.C. § 465
### in New York violates the 10th Amendment

94.   Plaintiffs repeat and reallege paragraphs "1" through "93 ", inclusive, of this Complaint as if fully set forth herein.

96.   Article I, § 1, of the U.S. Constitution provides that , "All legislative powers herein granted shall be vested in a Congress of the United States. . ."  Congress writes the laws that delegate some of its lawmaking authority to the executive branch and its unelected bureaucrats. However, the literal hijacking of state sovereignty and jurisdiction by  an administrative agency under the executive branch, as in this case, is an egregious overreach by an agency in derogation of the rights, guaranteed to states under the Constitution.

97.   The U.S. Constitution, Amendment 10 states:  "Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

98.   The ROD states that it derives its power from the Indian Commerce Clause, U.S. Constitution, Article I, § 8, clause 3.  The commerce clause is broad, but is not unlimited.   The Indian Commerce clause's grant of authority to Congress does not empower the executive branch to remove land from sovereign state control, especially when the land in question is not designated as "Indian Country."  New York has not consented to the cessation of its sovereign control over the lands in question.  The Supreme Court in Sherrill expressly ruled that the subject lands are not Indian Country, and not under federal superintendence.

20

99.   Therefore, the misapplication of Section 5 of the IRA and its implementing regulations is an unconstitutional power grab prohibited by the 10th Amendment to the Constitution as applied in states such as New York, that retained its right of pre-emption.

100.   Plaintiff's constitutional rights as state citizens are only protected if the sovereign authority of the State of New York is not disturbed.

### THIRD CLAIM FOR RELIEF

**The Determination was made without
proper compliance under 25 CFR Part 151**

101.   Plaintiffs repeat and reallege paragraphs "1" through "100 ", inclusive, of this Complaint as if fully set forth herein.

102.   In its final Decision dated May 20, 2008 and filed May 23, 2008, DOI adopted the aforementioned Alternative I-Preferred Alternative.  The ROD did not include an 82 acre parcel located in the Town of Stockbridge in Madison County.

103.   In describing the proposed action, Defendants acknowledged that as a result of its decision to acquire the land in trust, such land would be subject to tribal sovereignty, and immune from New York State and local governmental taxation and regulations.  See Record of Decision ("ROD") at 8.

104.   The ROD states that the authority for its actions were Section 5 of the IRA (25 U.S.C. § 465) and 25 C.F.R. Part 151 (ROD at 8).

105.   The ROD also states that OIN "had been lawfully conducting Class III gaming at Turning Stone under IGRA" and that "the casino is situate within the Oneida Reservation on Indian lands as defined to comply with IGRA".  See ROD at 8-9.

106.   The ROD further states that no further approvals were required by the State or DOI

21

with respect to the operation of said casino.

107.   The ROD also wrongly asserts that the parcels of land to be acquired in trust were part of OIN's "reservation" and, therefore, not subject to the more stringent two-part review applicable to "off-reservation" lands to be acquired into trust under 25 C.F.R. § 151.11.

108.   Section 18 of the IRA (25 U.S.C. §478) mandates that a vote of the adult members of the Tribes be taken to determine if the IRA is applicable to that tribe.  The Oneidas and all the other New York Indians voted against the application of the IRA.  A majority of the Oneidas voted again to reject the IRA in 1936. See Michael T. Smith, Memorandum to Director, Office of Indian Services, Bureau of Indian Affairs, dated Feb. 24, 1982 at 8.  (See also ROD at 33).  The ROD  also acknowledges that OIN had "opted out" of the applicability of the IRA pursuant to 25 U.S.C. § 478 (ROD at 33), but then Defendants asserted that under the provisions of 25 U.S.C. § 2202, Section 465 of the IRA nevertheless applied to the OIN (ROD at 34).

109.   The ROD further asserted that OIN had 32 acres under its sovereign authority and admitted that no acres were held in trust (ROD at 36).

110.   Then Defendants wrongly cited its authority for said actions under Section 5 of the IRA (25 U.S.C. § 465) and 25 C.F.R. part 151 (ROD at 8).  Defendant's also cited Article 1, Section 8, Clause 3; the Commerce Clause as the basis for taking New York sovereign land into trust on behalf of the OIN.

111.   The *Sherrill* decision, which involved OIN, and specifically held that the lands that are the subject of this ROD are not "Indian Country" and are not considered reservation lands for purposes of sovereignty and taxation.  In spite of that ruling, the Defendants wrongfully accepted this application under 25 C.F.R. §151.10 as "on reservation" applications in order to avoid the stricter scrutiny under the two-part determination required for "off-reservation" applications

22

under 25 C.F.R.§ 151.11.

112.   The failure of the defendants to correct this erroneous action by the BIA is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

113.   The ROD also fails to provide support for the conclusion that 13,003.89 acres in trust is necessary to satisfy the tribes goal of self-determination and other similar needs of the tribe.

114.   The ROD fails to adequately assess the impact this determination has on the local communities which is require by 25 C.F.R. 151.10 (e) and the NEPA analysis.

115.   The ROD fails to adequately address the concerns of the local communities.

116.   The ROD failed to adequately assess the viable alternatives of the commenters particularly the recommendation that a State Reservation be created which would prevent the unlawful taking of New York sovereign land.

117.   The ROD is unlawful and unconstitutional and would allow the OIN to continue its unfair advantage over other tax paying businesses.  The fact that OIN, once its lands are taken in trust, can enjoy unlimited commercial development on trust lands and not be subjected to the same taxes and regulatory burdens as neighboring businesses, creates an unfair advantage for OIN.  This is tantamount to subsidized government off-shoring in the backyard of the local citizens which has caused and will continue to destroy the legitimate private tax base.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**The determination is arbitrary and capricious, and abuse of discretion, and otherwise not in accordance with law because it fails to adequately assess the environmental impacts in accordance with the National Environmental Policy Act (NEPA)**

118.   Plaintiffs repeat and reallege paragraphs "1" through "117", inclusive, of this

23

Complaint as if fully set forth herein.

119.   Immediately after the <u>Sherrill</u> decision, the OIN applied to have 17,000 plus acres taken into trust by the Secretary of the Interior.  Through DOI, the Bureau of Indian Affairs ("BIA") began its NEPA review.  Some of the plaintiffs in the within action sued the DOI and the BIA calling for a NEPA analysis using the Programmatic Environmental Impact Statement ("PEIS") in order to give the numerous tribal applications fee to trust a more thorough analysis. A PEIS was deemed necessary, because all of the fee to trust claims had significant comprehensive legal questions due to the unique jurisdictional and constitutional problems posed by the attempted application of the IRA in New York.  The District Court dismissed the plaintiffs' Complaint indicating in the court's total lack of understanding of the land status in New York after <u>Sherrill</u>.  Interestingly, this is the same District Court Judge who's decision was overturned by the Supreme Court in <u>Sherrill</u>.

120.   The DOI, through the BIA commenced with preparation of a Draft Environmental Impact Statement which was completed on November 24, 2006.  The BIA conducted public comment sessions throughout the region.  The OIN was clearly in control of the sessions and shipped bus loads of employees to the events all clad in bright read t-shirts emblazoned with "My job, my vote" and pre-printed signs supporting the land in trust efforts.  Numerous individuals, public officials and citizens groups braved the madding crowd to present their time-limited comments after OIN representatives read a lengthy prepared statement which did not address NEPA issues.

121.   Throughout the process, OIN and its representatives threatened the closure of the Casino as among one of the dire events that would take place if land were not placed in trust. This sentiment is echoed in the Final Environmental Impact Statement ("FEIS").

122.   The DOI analyzed the various alternatives.  The Preferred Alternative, Alternative I, called for 13, 086 acres of OIN's 17,000 acre request to be placed in trust, including (a) all of the 3,428 acres in Oneida County where OIN operates the Class III Turning Stone casino, gaming-related activities and hotel, five adjacent golf courses, and a Sav-On gas station and convenience store; (b) approximately 6,475 acres in both Madison and Oneida County, including the location of the OIN's government, health, education and cultural facilities and activities, member housing, hunting lands, numerous non-gaming Nation enterprises, including 12 Sav-On gas stations and convenience stores, a newspaper operation, three marinas and agricultural operations, and ( c) approximately 7,467 acres in both Oneida and Madison Counties which were characterized in the Final Environmental Impact Statement as "generally underdeveloped, active and inactive agricultural lands."

123.   NEPA requires that "all agencies of the Federal Government shall…include in every recommendation or report on…major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official."  42 U.S.C. § 4332(2)(c). When enacting NEPA, Congress:

>"recogniz(ed) the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognize(ed) further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, (and) declare(d) that it is the continuing policy of the Federal Government, in cooperation with the State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."

42 U.S.C. § 4331(a).

124.   Plaintiffs' interest in the environmental and economic well-being of the State of
New York are among the interests to be considered under 25 C.F.R. § 151.10(f), 151.10 (h)
before land is placed into trust.  *See, e.g.*, TOMAC v. Norton, 193 F. Supp. 2d 182 (D.D.C. 2002)
*aff'd*, 433 F.3d 852 (D.C.Cir. 2006*)* (holding that a community group had standing to challenge
the BIA's decision to take land into trust for the construction of a casino under the Indian Gaming
Regulatory Act) and 25 C.F.R. § 151.10 (f), (h); *see also Citizens Exposing Truth About Casinos
v. Norton,* 2004 U.S. Dist. LEXIS 27498, at *6 & n.3 (D.D.C. Apr. 23, 2004) (holding that a
citizen's group had standing under the Indian Reorganization Act, found at 25 U.S. C. § 461-475,
to challenge a trust acquisition because the Act's implementing regulations provide for
consideration of land use conflicts and NEPA requirements). *Cf. City of Sherrill v. Oneida Indian
Nation,* 544 U.S. 197; 125 S. Ct. 1478, 1493; 161 L. Ed. 2d 386 (2005) ("If (the Tribe) may
unilaterally reassert sovereign control and remove these parcels from the local tax rolls, little
would prevent the Tribe from initiating a new generation of litigation to free the parcels from
local zoning or other regulatory controls that protect all landowners in the area..")

125.   Under the Departmental Manual of the BIA for the application of NEPA in the fee
to trust process, the BIA allows the tribes making the fee to trust applications to act as "lead
agency" for the completion of the NEPA documentation.  This presents an inherent conflict of
interest in terms of producing a fair and unbiased report which takes into consideration the needs
of the surrounding communities.

126.   According to the BIA, they represent only the interests of the Indian tribe as
defined by the Tribe submitting the fee to trust application.

26

127.    This position of the BIA on NEPA is based on federal common law district court rulings that held that the state and local governments did not have standing to sue against the fee to trust applications of Indian tribes because they were not within the "zone of interests" to be protected by the IRA and 25 U.S.C. § 465.  See *City of Tacoma et al v. Andrus et al*, 458 F. Supp. 465 (D.D.C. 1978) and *City of Sault Ste. Marie v. Andrus*, 458 F. Supp. 465 (D.D.C. 1978).

128.    The above district court opinions have been effectively overruled by *Sherrill* and the promulgation of the new regulations implementing 25 U.S.C. § 465. See 25 C.F.R.§151 et. seq. (2004).

129.    As prepared, the Final EIS for the fee to trust applications of the OIN does not address any of the factors deemed part of the "justifiable expectations" of the local non-Indian residents or state and local governments identified in the *Sherrill* decision as disruptive.

130.    The regulatory and cumulative jurisdictional impacts of removing thousands of acres from the sovereign control of state and local governments has not been adequately addressed.

## FIFTH CLAIM FOR RELIEF

### Violation of 42 U.S. C. § 1981

131.    Plaintiffs repeat and reallege paragraphs "1" through "130", inclusive, of this Complaint as if fully set forth herein.

132.    Persons of Oneida Indian descent, like plaintiff Melvin Phillips, have been treated as white citizens of the State of New York since the 1930's.  This means that they have enjoyed full rights as citizens of the United States and the State of New York.  The only distinction in their rights as citizens is that the Oneidas residing on the 32 acre parcel in Madison County and State land at Marble Hill, Town of Vernon, Oneida County is that they are immune from state

taxation.

133. The defendants assert the right under the ROD to rekindle the sovereignty of the Oneida Indian tribe in New York.

134. This action by the defendants will subject persons of Oneida Indian descent to tribal laws that do not the constitutional rights enjoyed by their white neighbors in violation of 42 U.S.C. § 1981. See Santa *Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)

135. According to the defendants, persons of Oneida descent will again become wards of the federal government after being treated as full citizens of New York and the United States for more than 150 years.

## THE SIXTH CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1983

136. Plaintiffs repeat and reallege paragraphs "1" through " 135", inclusive, of this Complaint as if fully set forth herein.

137. The OIN initially applied for 17,130 acres to be placed into federal trust status pursuant to 25 U.S.C. § 465.

138. Just as in the *Sherrill* case, the OIN assert in the final EIS that several alternatives exist for allowing up to 35,000 acres of land that has been under state jurisdiction since before the Constitution of the United States went into effect may be placed into federal trust status.

139. The OIN claims for fee to trust are essentially the same land claim advanced in *Sherrill*.

140. Since the *Sherrill* decision, the underlying land claim case that asserted the possessory rights of the OIN was dismissed by the Federal District Court based on *Cayuga Indian Nation v. Pataki*, 423 F.3d 266 (2nd Cir. 2005), cert denied 2006 LEXIS 3949 (U.S., May 15,

2006). *Oneida Indian Nation v. New York*, 500 F. Supp. 2d 128 (N.Y.N.D. 2007).

141.   The Cayuga decision expanded upon the *Sherrill* ruling to include all types of possessory land claims as being subject to the equitable considerations enumerated in *Sherrill*. The Cayuga majority concluded that the land claim of the Cayuga Indian Nation should be dismissed in its entirety and that the equitable considerations for the disruptive effects were also applicable against the United States as trustee of the Tribe.

142.   The Cayuga majority concluded that the United States was bound to act on behalf of the private interest of the Cayuga Tribe and therefore it was not acting in its sovereign capacity to protect the public interest by asserting the land claim.

143.   Similarly, the defendants, by asserting solely the interests of persons of Oneida descent to re-establish their long extinguished claims of tribal sovereignty is racially discriminating against every other resident of Madison and Oneida Counties in violation of 42 U.S.C. § 1983.

144.   The Oneida Indians did not maintain tribal political relations with the United States. In fact, Oneida descendants had to petition the United States to protect their lands from alienation in *U.S. v. Boylan*, 256 F. 468 (N.D.N.Y. 1919), *aff'd* 265 F.165 (2nd Cir. 1920)  From the time of the *Boylan* decision, until the Indian Claims Commission case was withdrawn by the Oneidas, the United States did not recognize any Oneida tribe in New York.  The OIN was not recognized under the C.F.R. part 83 regulations.

145.   Instead, the Assistant Secretary assumed Raymond Halbritter had united all of the remaining descendants of the Oneida of New York.  The only recognition was to Raymond Halbritter as a temporary leader.  See attached letter of Ada Deer 1993.

146.   The recognition of Raymond Halbritter as an Oneida Indian with special rights

based upon his alleged descent, to rekindle the rights of an Indian tribe whose "embers of sovereignty had long grown cold," constitutes invidious racial discrimination by the defendants in violation of 42 U.S.C. § 1983 against all other residents in Oneida and Madison Counties.

## SEVENTH CLAIM FOR RELIEF

### Violation of 42 U.S.C. § 1985

147.   Plaintiffs repeat and reallege paragraphs "1" through " 146 ", inclusive, of this Complaint as if fully set forth herein.

148.   Deciding to place thousands of acres of land that has always been under state jurisdiction into Indian territorial status by taking it into federal trust can benefit only persons of Indian descent.

149.   The United States DOI and the Department of Justice have been thwarted in their attempts to restore lands to the New York Indian tribes in land claim cases that have been litigated for more than 30 years and have cost taxpayers of New York millions of dollars to defend.

150.   In the actual land claim case on the Oneida tribes , 74 CIV 187, the Department of Justice ("DOJ") finally admitted it was developing a new policy with the BIA to deal with the Sherrill and Cayuga decisions.  This new policy first appeared in January, 2008. It was used to moot the PEIS case filed by some of these plaintiffs.  See ROD at Section 3.1.4.1  This new policy has now been incorporated into new regulations for 25 U.S.C. § 2719, Section 20 for land acquired after 1988.  The new 25 C.F.R. Part 292 regulations should apply to this fee to trust ROD for the OIN.

151.   Instead, the ROD says that all prior determinations are not subject to review in the ROD.

152.   The BIA has had a common policy or scheme to "create" a federal Indian reservation for the OIN in New York since 1935.

153.   In 1935, Congress passed an act to make the site of Fort Stanwix (Fort Schuyler) a National Monument.  See 40 Stat. 665.

154.   National Monuments are administered by the National Park Service, a branch of the DOI.  Fort Stanwix was the site where the Treaty of 1788 was negotiated and entered into between the State of New York and the Oneida tribe.  Fort Stanwix was the "carrying place" of the Oneidas.   By portaging between the Mohawk River and Wood Creek, the Oneida could transport goods all over New York.

155.   The right of passage over the waterways and over the carrying place was specifically reserved to the Oneidas in the Treaty of 1788.  The federal Treaty of Canandaigua in 1794 acknowledged and further protected this right of passage.  A right of passage is a vested right under the Public Trust doctrine that is enforceable as a federal reserved right for hunting, fishing and commerce.

156.   This right of passage has been litigated as a reserved right in the Six Nations of the Iroquois confederacy.  See *F.P.C. v. Tuscarora Indian Nation*, 362 U.S. 99 (1960).  The State of New York has not directly interfered with the right of passage of the Oneidas.

157.   The Oneidas right of passage has been effectively rendered a nullity because the Oneidas have had no land base on which or from which to exercise the right of passage and the concomitant rights to conduct commerce or hunt and fish.

158.   Neither of the federal common law reserved rights cases of *United States v. Winans*, 198 U.S. 371 (1905) or *Winters v. United States*, 207 U.S. 564 (1908), may be made applicable in New York without the Oneidas regaining a land base to which the right of passage may attach.

31

159.   The DOI has systematically sued the State and the people of New York trying to connect a land interest of the Oneidas to this reserved right of passage.

160.   Beginning in the late 1950's, the United States asserted that pursuant to the Federal Power Act of 1935, the state lands of the Tuscarora Indians could be considered a federal Indian reservation as defined in 16 U.S.C. § 792.

161.   The very broad definition of "federal reservation" contained in 16 U.S.C. § 792 was applied in New York to Indian lands reserved by the State for the continued occupancy of descendants of the Iroquois Confederacy.

162.   That same definition from 16 U.S.C. § 792 could be applied to Fort Stanwix National Monument to attach rights reserved to the Oneidas in the treaties to any lands the federal government can define as being under the resurrected sovereignty of the Oneidas.

163.   Lands in fee title to the Oneidas that do not have tribal sovereignty rights attached cannot be used by the defendants to threaten the jurisdiction and sovereignty of the State of New York unless "converted" into a land classification that re-attaches the sovereign rights of the Oneidas.

164.    From 1935 forward, this has been the scheme of the United States to rekindle the embers of sovereign rights in the Oneidas and other tribes, that have long ago grown cold.  The scheme will continue until there is an enforceable means to limit the IRA as Congress intended in 1934.

165.   The scheme violates the equal protection rights of all non-Indian citizens of New York.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the court enter judgment as follows:

A.   That the federal defendants are without authority to take any lands into federal trust status for the OIN and that such actions as challenged herein, are unconstitutional, illegal, arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law;

B.   That the OIN/BIA is required to assess the jurisdictional issues and the disruptive impacts that acquiring fee lands into federal trust would cause on the state and local communities:

C.   That the Final EIS be declared insufficient to meet the requirements of NEPA;

D.   That the Secretary of Interior has no authority to take fee lands into trust status in the State of New York for the private interest of Indian Tribes if such act disrupts the state and local governance for the overwhelming majority of the People of New York

E.   Enjoining Defendants, their agents, employees, successors and assigns in office from taking any action to effectuate or implement the decision dated May 20, 2008 and published on May 23, 2008 taking 13,003.89 acres into trust;

F.   Awarding Plaintiff's Attorney's fees and costs in this action pursuant to the Equal Justice Act;

G.   Awarding Plaintiff's damages and attorney's fees under 42 U.S.C. § 1988; and

H.   Granting such other and further relief as to the court seems just and proper.

Respectfully submitted,
/s/ Claudia L. Tenney
Claudia L. Tenney, Bar No. 602210
28 Robinson Road
Clinton, New York 13323
315-853-3023/315-794-7788
clearyc@@aol.com

/s/ James J. Devine
James J. Devine, Bar No. 101492
128 Oneida Street
Oneida, NY 13421
Tel. (315) 363-6600
Fax. (315) 363-4414
ATTORNEYS FOR PLAINTIFFS