UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

STATE OF NEW YORK, *et al.*,

           Plaintiffs,

    -against-                            6:08-CV-00644 (LEK/DEP)

KENNETH SALAZAR,[1] Secretary, United
States Department of the Interior, *et al.*,

           Defendants,

    -and-

ONEIDA NATION OF NEW YORK,

           Defendant-Intervenor.

_____

CITY OF ONEIDA, NEW YORK,

           Plaintiff,

    -against-                            5:08-CV-00648 (LEK/DEP)

KENNETH L. SALAZAR, Secretary
of the United States Department of
Interior, *et al.*,

           Defendants.

_____

UPSTATE CITIZENS FOR EQUALITY,
Inc., *et al.*,

           Plaintiffs,

_____

[1]  As Secretary of the United States Department of the Interior, Kenneth Salazar replaces
Dirk Kempthorne as a Defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).
Across the several related cases presently before the Court, many parties have been replaced
pursuant to Rule 25(d); for the remainder of this Memorandum-Decision and Order, the Court will
refer to all parties as they are currently listed on each docket.

-against-                                                        5:08-CV-00633 (LEK/DEP)

UNITED STATES OF AMERICA, *et al.*,

                            Defendants.
_____

TOWN OF VERONA, *et al.*,

                            Plaintiffs,

    -against-                                                   6:08-CV-00647 (LEK/DEP)

KENNETH L. SALAZAR, in his official
capacity as United States Secretary of the
Interior; *et al.*,

                            Defendants.
_____

CENTRAL NEW YORK FAIR
BUSINESS ASSOCIATION, *et al.*,

                            Plaintiffs,

    -against-                                                   6:08-CV-00660 (LEK/DEP)

KENNETH L. SALAZAR, *et al.*,

                            Defendants.
_____

## **MEMORANDUM-DECISION and ORDER**

## I.    INTRODUCTION

    Presently before the Court are eleven Motions for summary judgment filed across five

related cases:[2] State of New York, *et al.* v. Salazar, *et al.*, No. 6:08-CV-00644; City of Oneida v.

_____

    [2] Although these cases are not officially consolidated, this Memorandum-Decision and
Order is being issued in each of the related cases in the interest of judicial economy.

Salazar, et al., No. 5:08-CV-00648; Upstate Citizens for Equality, Inc., et al. v. United States of America, et al., No. 5:08-CV-00633; Town of Verona, et al. v. Salazar, et al., No. 6:08-CV-00647; and Central New York Fair Business Association, et. al. v. Salazar, et al., No. 6:08-CV-00660.[3]  Plaintiffs in each of these related cases brought suit to challenge a May 20, 2008 Record of Decision issued by the Department of Interior that accepted over 13,000 acres of land in central New York into trust for the benefit of the Oneida Indian Nation of New York.

For the reasons stated below, the Court remands the Record of Decision to the Department of Interior to further develop the record on whether the Department of Interior has statutory authority to take this land into trust pursuant to the Indian Reorganization Act.

## II.    BACKGROUND

### A.  Factual Background

The Court presumes the parties' familiarity with the factual history underlying each of these related cases, but summarizes the basic history here for the sake of context and completeness.

On April 4, 2005, the Oneida Indian Nation of New York ("OIN") submitted a request to the Department of Interior ("DOI")'s Bureau of Indian Affairs ("BIA") requesting that the Secretary of the Interior (the "Secretary") take approximately 17,370 acres in trust for the OIN. Dkt. No. 238-12 ("ROD") at 2, 6.[4]  The request included 330 parcels, or 440 tax lots, all owned

---

[3]  A sixth related case, Niagara Mohawk Power Corporation v. Kempthorne, et al., No. 5:08-CV-00649 (LEK/GJD) was dismissed pursuant to a voluntary stipulation of settlement and dismissal on July 28, 2009.

[4]  As a general matter, in referring to the parties' submissions, the Court uses the page numbers at the bottom of each page as opposed to the numbers at the top that have been electronically inserted by the Clerk of the Court.

by the OIN and located in Madison County and Oneida County, New York.  Id. at 6.  According

to the ROD, the OIN "submitted its fee-to-trust request in response" to the Supreme Court's

decision in City of Sherrill v. Oneida Indian Nation of New York, 544 U.S. 197 (2005) ("Sherrill

III").  ROD at 6.

The OIN's fee-to-trust request categorized the 17,370 acres requested into three groups,

as follows:

> **Group 1** lands comprise approximately 3,428 acres in Oneida County and are the
> location of the Nation's Turning Stone Resort & Casino, which includes a Class III
> casino under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq.,
> gaming-related amenities, five neighboring golf courses, and one SavOn gas station and
> convenience store.

> **Group 2** lands comprise approximately 6,475 acres in Madison County and Oneida
> County and are the location of Nation government, health, education, and cultural
> facilities and activities; member housing; hunting lands; and numerous non-gaming
> Nation enterprises, including 12 SavOn gas stations and convenience stores, a newspaper
> operation, three marinas, and agricultural operations.

> **Group 3** lands comprise approximately 7,467 acres in Madison County and Oneida
> County and are generally undeveloped, active and inactive agricultural lands.

ROD at 6.

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 et seq.,

DOI issued a draft Environmental Impact Statement ("EIS") regarding the proposed fee-to-trust

request on November 24, 2006.  ROD at 2, 6.  Public comments were solicited until February 22,

2007, and public hearings were held on December 14, 2006 in Utica, New York and on February

6, 2008 in Verona, New York.  Id. at 2, 6-7.  DOI issued its final EIS on February 22, 2008.  Id.

at 2, 7.

On May 20, 2008, DOI, "based on the Department's review of the Draft EIS, the Final

EIS, comments received from the public, Federal agencies, State agencies, local governmental

entities, and potentially affected Indian tribes, and the applicable statutory and regulatory criteria

for acquiring title to lands in trust status[,]" issued its decision to accept approximately 13,003.89

acres in trust for the OIN.  Id. at 2.  The land to be accepted into trust included all Group 1 lands,

as well as some Group 2 and Group 3 lands neighboring the Nation's 32-acre territory in

Madison County or neighboring the Turning Stone Resort & Casino in Oneida County.  Id. at 7.

### B.  Procedural History

#### 1.  State of New York, et al. v. Salazar, et al.[5]

Plaintiffs State of New York; Andrew M. Cuomo (substituted for David A. Paterson in

his capacity as Governor of the State of New York); Madison County, New York; Oneida

County, New York; and Eric T. Schneiderman (substituted for Andrew M. Cuomo in his capacity

as Attorney General of the State of New York) (collectively, "Plaintiffs") filed this action on June

19, 2008, challenging the May 20, 2008 ROD.  Dkt. No. 1 ("Complaint").  Plaintiffs later filed a

Second Amended and Supplemental Complaint, which is the final pleading in this action.  Dkt.

No. 94 ("SASC").

By Memorandum-Decision and Order issued September 29, 2009, and pursuant to

Motions filed by Defendants (Dkt. Nos. 36, 111) and Defendant-Intervenor OIN (Dkt. Nos. 51,

110), the Court dismissed Counts 1, 2, and 17 though 22 of Plaintiffs' Second Amended and

Supplemental Complaint.  Dkt. No. 132.  The Court also denied Plaintiffs' Motion (Dkt. No. 57)

_____

[5]  For purposes of this section, all party names and docket numbers referenced are those
found in State of New York, et al. v. Salazar, et al., No. 6:08-CV-00644(LEK/DEP).

for summary judgment on Count 3 of their Second Amended and Supplemental Complaint.  Dkt. No. 132.

Plaintiffs' remaining claims are as follows: that DOI lacked jurisdiction to take the subject land into trust because 25 U.S.C. § 465 does not apply to the OIN (Count 3); that DOI's determination was not in accordance with law because it was made contrary to prior DOI policies (Count 4); that DOI's determination was biased in favor of the OIN in violation of both Plaintiffs' due process rights and the APA (Count 5); that DOI wrongly applied the on-reservation standard rather than the off-reservation standard to the OIN application (Count 6); that DOI's determination was made without regard to the OIN's need for the additional land (Count 7); that DOI's determination was made without regard to the impacts on the State and its subdivisions of the removal of the land from the tax rolls (Count 8); that DOI did not adequately consider potential land use and other jurisdictional problems (Count 9); that DOI did not adequately consider whether the BIA is equipped to take on the additional responsibilities of managing the subject land (Count 10); that DOI failed to take into account existing easements, leases, and rights of way (Count 11); that DOI did not ensure that the OIN had satisfied outstanding tax liens as required under the regulations (Count 12); that the requirements of the National Environmental Policy Act ("NEPA") were not followed (Counts 13 and 14); that DOI violated FOIA requirements (Count 15); and that DOI failed to disclose required documents underlying the environmental impact statement (Count 16).

Presently before the Court are Motions for summary judgment, each filed on November 15, 2011, by Plaintiffs, Defendants, and Defendant-Intervenor OIN.  Dkt. Nos. 237 ("Plaintiffs' S.J. Motion"), 240 ("Defendants' S.J. Motion"), 236 ("OIN's S.J. Motion").  The parties each

filed a Response in opposition to the respective Motions on January 30, 2012.  Dkt. Nos. 259

("Plaintiffs' Response"), 261 ("Defendants' Response"), 260 ("OIN's Response").  And, on

March 15, 2012, each party filed a Reply.  Dkt. Nos. 271 ("Plaintiffs' Reply"), 272 ("Defendants'

Reply"), 270 ("OIN's Reply").

### 2. City of Oneida v. Salazar, *et al.*[6]

Plaintiff City of Oneida, New York ("Plaintiff" or "City of Oneida") commenced this

action against Defendants Kenneth L. Salazar, Secretary of the United States Department of

Interior; P. Lynn Scarlett, Deputy Secretary of the United States Department of the Interior;

James E. Cason, Associate Deputy Secretary of the Interior; and Franklin Keel, Regional Director

of the Eastern Regional Office of the Bureau of Indian Affairs (collectively, "Defendants") by

Complaint filed June 19, 2008.  Dkt. No. 1 ("Complaint").  Plaintiff's Complaint sought

declaratory and injunctive relief preventing DOI from accepting the subject lands in trust for the

benefit of the OIN.  Id. at 1.

On October 2, 2008, Defendants filed a Motion to dismiss Plaintiff's first and second

causes of action which alleged that § 465 of the Indian Reorganization Act ("IRA") represented

an unconstitutional delegation of legislative authority on its face and as applied to this trust

application.  Dkt. No. 14.  The Court granted this Motion by Memorandum-Decision and Order

issued September 21, 2009.  Dkt. No. 37.

Plaintiff's remaining claims are as follows: that the IRA does not apply to the OIN

because the parcels were not covered by the General Allotment Act (Count 3); that DOI erred by

---

[6] For purposes of this section, all party names and docket numbers referenced are those
found in City of Oneida v. Salazar, *et al.*, No. 5:08-CV-00648 (LEK/DEP).

treating the parcels of land as "on-reservation" under the relevant regulations (Count 4); that DOI did not properly consider the impact of its trust decision on local governments pursuant to its regulations (Counts 5, 6, and 7); that DOI did not properly consider the City of Oneida's concerns regarding potential impacts on the City's water and sewer systems (Count 8); that DOI did not properly consider easements and/or rights of way held by the City of Oneida to access a water transmission main (Count 9); that DOI's decision to take the parcels of land into trust without adequately protecting the City of Oneida's easements and/or rights away constituted an uncompensated taking in violation of the Fifth Amendment of the United States Constitution (Count 10); and that DOI did not properly consider various regulatory and jurisdictional problems that may result from taking the subject land into trust (Count 11).  See generally Compl.

Presently before the Court is Defendants' Motion, filed November 15, 2011, which seeks summary judgment on all of Plaintiff's remaining claims.  Dkt. No. 45.  Plaintiff has filed a Response in Opposition, and Defendants have filed a Reply.  Dkt. Nos. 49, 50.

### 3. Upstate Citizens for Equality, Inc., *et al.* v. United States of America, *et al.*[7]

On June 16, 2008, Upstate Citizens for Equality, Inc., a non-profit corporation comprised of central New York residents, and a number of UCE's members, David Vickers, Richard Tallcot, Scott Peterman, Daniel T. Warren (collectively "Plaintiffs") brought suit against the United States of America, and governmental entities and officials Kenneth A. Salazar; P. Lynn Scarlett; James Cason; United States Department of the Interior; Philip N. Hogen; National Indian Gaming Commission; and Michael B. Mukasey (collectively "Defendants"), challenging

---

[7] For purposes of this Section, all party names and docket numbers referenced are those found in Upstate Citizens for Equality, Inc. v. USA, No. 5:08-CV-00633 (LEK/DEP).

8

the decision of DOI to put thirteen thousand acres into trust for the OIN.  See generally Dkt. No.

1 ("Complaint").  Plaintiffs argued, *inter alia*: that Defendants acted in excess of their statutory

authority in taking any land into trust under the IRA (Count 1); that the IRA is unconstitutional

on its face and as applied (Count 2); that Defendants acted arbitrarily and capriciously, contrary

to law, or without observance of proper procedure in reaching their decision and putting the land

into trust (Count 3); that Defendants' decision to take land into trust without ensuring that there

will never be illegal gambling at the site violates the IGRA and was arbitrary and capricious in

violation of the APA (Count 4); that Defendants violated the statutory procedures mandated by

IGRA §§ 2710 and 2719 (Count 5); that a 2007 Agency letter relating to the IGRA was arbitrary

and capricious in violation of the APA (Count 6); and that the Court should issues a writ of

mandamus "compelling Defendants to carry out their statutory duties" based on general

allegations of non-compliance with various laws (Count 7).  See generally Compl.

Subsequently, on January 29, 2009, Plaintiffs filed a Supplemental Claim raising a

separate challenge to DOI's acceptance of custody of eighteen acres of excess federal land in trust

for the OIN pursuant to a mandatory transfer from the General Services Administration ("GSA").

Dkt. No. 35.

Defendants moved to dismiss Plaintiffs' attacks on the constitutionality of DOI's trust

determination as to the approximately 13,000 acres on behalf of the OIN and on the validity of

the § 523 transfer of the eighteen acres from the GSA.  Additionally, Defendants moved to

dismiss assorted challenges by Plaintiffs relating to the operation of the Turning Stone Casino in Verona, New York by the OIN.   See generally Dkt. Nos. 23, 45.[8]

On March 4, 2010, the Court granted Defendants' Motion in its entirety.   Dkt. No. 49.   In so doing, the Court dismissed Plaintiffs': "(a) non-delegation claim, (b) IGRA compliance claim, (c) gaming compact claim challenging Defendant Cason's June 13, 2007 letter, (d) claim challenging the NIGC's 1994 approval of the gaming compact, and (e) claim seeking to enjoin Defendant officials to take enforcement actions pursuant to IGRA."   Id. at 30-31.   The Court also dismissed Plaintiffs' supplemental claim.   Id. at 31.

On November 15, 2011, Defendants filed a Motion for summary judgment.   Dkt. No. 57.   On the same date, Plaintiffs filed a Letter Motion for summary judgment.   Dkt. No. 58.   In January of 2012, Plaintiffs and Defendants each filed Responses in opposition to the respective Motions.   Dkt. Nos. 59, 60.   They also each, in turn, filed Replies to the Responses in March of 2012.   Dkt. Nos. 62, 63.   Presently before the Court are the parties' dueling Motions for summary judgment.

4. Town of Verona, et al. v. Salazar, et al.[9]

---

[8]   Specifically, Plaintiffs had raised challenges to the Casino's compliance with the Indian Gaming Regulatory Act ("IGRA") and to what they argue was a final agency action by DOI in the form of a letter stating that DOI was declining to reconsider further DOI's 1993 approval of a gaming compact between the OIN and New York State.   Further, Plaintiffs asserted a challenge to the National Indian Gaming Commission's 1994 approval of the OIN's gaming ordinance. Plaintiffs also sought to require the government to implement and enforce IGRA as to the United States generally or the OIN's facility in particular. 25 U.S.C. §§ 2701-2721.   See generally Compl.

[9]   For purposes of this section, all party names and docket numbers referenced are those found in Town of Verona, et al. v. Salazar, et al., No. 6:08-CV-00647 (LEK/DEP).

Plaintiffs Town of Verona, Town of Vernon, Abraham Acee, and Arthur Strife (collectively, "Plaintiffs") commenced this action against Defendants Kenneth L. Salazar, United States Secretary of the Interior; the United States Department of the Interior; and Mark Filip, in his official capacity as Attorney General of the United States (collectively, "Defendants") by Complaint filed June 19, 2008.  Dkt. No. 1 ("Complaint").  Plaintiffs' Complaint raised the following claims: that the IRA, as applied, violated the Tenth Amendment (Claim 1); that the IRA does not apply to the OIN because the parcels were not covered by the General Allotment Act and because the OIN was not federally recognized and under Federal jurisdiction at the time of the IRA's enactment in 1934 (Claim 2); that the OIN's gaming facility violates IGRA, and that DOI failed to properly consider various factors under the relevant statutes such that their determinations were illegal, arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law (Claim 3).  See generally Compl.

 On September 22, 2008, Defendants filed a Motion seeking partial dismissal of Plaintiffs' Complaint.  Dkt. No. 10.  On November 18, 2008, Plaintiffs filed a Motion seeking summary judgment with respect to their second claim.  Dkt. No. 18.  By Memorandum-Decision and Order issued September 29, 2009, the Court granted Defendants' Motion – dismissing Plaintiffs' claim under the Tenth Amendment, Plaintiffs' claims relating to IGRA, and any claims against the Attorney General of the United States – and denied Plaintiffs' Motion.  Dkt. No. 38.

Presently before the Court are Plaintiffs' Motion for summary judgment and Defendants' Motion for summary judgment, both filed on November 15, 2011.  Dkt. Nos. 46, 47.  On January 30, 2012, both parties filed Responses in opposition to the respective Motions.  Dkt. Nos. 49, 50. On March 15, 2012, the parties each filed a Reply.  Dkt. Nos. 100, 101.

5.  Central New York Fair Business Association, *et. al.* v. Salazar, *et al.*[10]

On June 21, 2008, citizens groups Central NY Fair Business Association, Citizens Equal

Rights Alliance, New York State Assemblyman David R. Townsend, Oneida County Legislators

Michael J. Hennessy and D. Chad Davis, and Melvin L. Phillips (collectively "Plaintiffs")

brought suit against federal officials Kenneth L. Salazar, P. Lynn Scarlett, James E. Cason,

Franklin Keel, and James T. Kardatzke, as well as Arthur Raymond Halbritter, "the Federally

Recognized Leader of the Oneida Indian Nation", challenging the ROD.  See generally Dkt. No.

1.  Plaintiffs allege, *inter alia*: that the IRA as applied in New York is a violation of 5 U.S.C. §

706 (Count 1); that DOI's application of 25 U.S.C. § 465 in New York violates the Tenth

Amendment to the United States Constitution (Count 2); that DOI's determination was made

without proper compliance under 25 CFR Part 151 (Count 3); that the ROD was arbitrary and

capricious, an abuse of discretion, and otherwise not in accordance with law because it failed to

adequately assess the environmental impacts in accordance with NEPA (Count 4); that the ROD

would interfere with the civil and citizenship rights of Oneida in violation of 42 U.S.C. § 1981

(Count 5); that "Defendants, by asserting solely the interests of persons of Oneida descent to

re-establish their long extinguished claims of tribal sovereignty . . . racially discriminat[ed]

against every other resident of Madison and Oneida Counties in violation of 42 U.S.C. § 1983"

(Count 6); and that the regulatory scheme violates the rights of non-Indian citizens under 42

U.S.C. § 1985 (Count 7).  See generally id.

---

[10]  For purposes of this Section, all party names and docket numbers referenced are those found in Central NY Fair Business Association et al. v. Salazar et al., No. 6:08-CV-660 (LEK/DEP).

Defendants moved for partial dismissal, arguing against the validity of seven claims.  Dkt.

No. 21.  Additionally, Defendants sought the dismissal of Defendant Halbritter as a party to the

case.  Dkt. No. 23.  Subsequent to a Stipulation by the parties, and with the Court's approval,

several Plaintiffs submitted an Amended Complaint on May 8, 2009, which challenges a

December 30, 2008 transfer of approximately eighteen acres of land from the GSA to DOI to be

held in trust for the OIN.  Dkt. No. 58.

On March 1, 2010, the Court granted Defendants' Motion for partial dismissal in its

entirety, dismissing Plaintiffs' Tenth Amendment claim; non-delegation claim; NEPA claim; 42

U.S.C. § 1981 claim; 42 U.S.C. § 1983 claim; 42 U.S.C. § 1985 claim; and IGRA claim.  See

generally Dkt. No. 74.  The Court also granted Defendants' Motion for partial dismissal of the

claims in the Amended Complaint, dismissing claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985,

and 1986; the NEPA claim; the challenge to the December 30, 2008 transfer of eighteen acres

into trust; and any claims against Defendant Halbritter.  See id. at 27.  Plaintiffs' Motion for

reconsideration of the Court's decision was subsequently denied.  Dkt. No. 83.

On November 15, 2011 Defendants filed Motions for summary judgment.  Dkt. Nos. 90,

91.  On the same day, Plaintiffs filed their own Motion for summary judgment on the claim that

§ 465 of the IRA does not apply in New York.  Dkt. No. 92.  In January of 2012, the parties filed

Responses to the Motions.  Dkt. Nos. 94, 95, 97.  And on March 15, 2012, the parties each

respectively filed Replies.  Dkt. Nos. 100, 101.  Presently before the Court are the Motions for

summary judgment.

III.    STANDARD OF REVIEW

    A.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, if the moving party has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to demonstrate "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

At the same time, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). The court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

**B. Administrative Procedure Act**

Under the APA, a district court may set aside an agency's findings, conclusions of law, or actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In reviewing agency action, [a] [c]ourt may not 'substitute its judgment for that of the agency.'" Natural Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Rather, a reviewing court's task is to determine "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Nat'l Ass'n of Homebuilders v. Defenders of Wildlife, 551 U.S. 664, 658 (2007) (internal quotations and citations omitted)

To this end, courts have "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." Chevron U.S.A., Inc. v. N.R.D.C., Inc., 467 U.S. 837, 844 (1984). Similarly, agency interpretations of their own regulations are "controlling unless plainly erroneous or inconsistent with the regulation." Auer v. Robbins, 519 U.S. 452, 461 (1997) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359 (1989); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)) (internal quotations omitted).

Nevertheless, a reviewing court's "inquiry must be searching and careful." Natural Res. Def. Council, Inc. v. FAA, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks and citations omitted). An agency decision may be deemed arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of U.S., Ind. v. State Farm Mut. Auto. Ins. Co. ("State Farm"), 463 U.S. 29, 43 (1983); see also Yale New Haven Hosp. v. Leavitt, 470 F.3d 71, 79 (2d Cir. 2006).

Further, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1491 (D.C. Cir. 1995)); see also Islander East Pipeline Co., LLC v. McCarthy, 525 F.3d 141, 151 (2d Cir. 2008) ("This is not to suggest that judicial review of agency action is merely perfunctory. To the contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful.") (internal quotation marks and citations omitted).  In order for an agency's decision to survive judicial review, the agency must have articulated "a rational connection between the facts found and the choice made." Henley v. FDA, 77 F.3d 616, 620 (2d Cir. 1996) (internal quotation marks omitted).

## IV.   DISCUSSION

### A.  New York v. Salazar[11]

#### 1.  IRA Jurisdiction

##### a.  The Parties' Historical Arguments[12]

---

[11]  For purposes of this section, all party names and docket numbers referenced are those found in State of New York, et al. v. Salazar, et al., No. 6:08-CV-00644(LEK/DEP).

[12]  The parties have provided voluminous briefs and numerous exhibits relating to the historical tribal status of the OIN.  While providing a blow-by-blow description of the parties arguments and historical accounts would be both unnecessary and inefficient, the Court summarizes

In their extensive briefing, the parties debate whether the OIN is eligible to have land taken into trust under the IRA.  See, e.g., Dkt. Nos. 259 at 3-16; 261 at 10-37; 271 at 5-41.  The question central to this argument is whether the OIN was under federal jurisdiction at the time of the IRA's enactment in 1934.

In Carcieri v. Salazar, the Supreme Court concluded that the IRA limits DOI's trust authority to tribes that were federally recognized and under federal jurisdiction when the IRA was enacted in 1934.  555 U.S. 379, 382 (2009).  That is, the operative question for a court or the Agency in determining whether trust authority may properly be exercised is whether the tribe in question was federally recognized and under federal jurisdiction in 1934 – not whether the tribe was federally recognized and under federal jurisdiction at the time of the trust decision.  See id. ("We agree with petitioners and hold that, for purposes of § 479 [of the IRA], the phrase 'now under Federal jurisdiction' refers to a tribe that was under federal jurisdiction at the time of the statute's enactment").

It is critical to the Court's review of the ROD and to the disposition of the instant motions to recognize that Carcieri was decided some months after the ROD was issued.  Therefore, at the time of the ROD, the Supreme Court had yet to clarify the appropriate jurisdictional inquiry under the IRA.  In their briefings before the Court, therefore, the parties substantively raise – for the first time in this matter – divergent historical narratives of the OIN's relationship with the U.S. government.

---

the arguments in an effort to add context and clarity to this Memorandum-Decision and Order.  The Court notes, however, that it does not provide an exhaustive list of all of the arguments raised by any party.  In omitting mention or discussion of some lines of argument or set of exhibits, the Court takes no position on the validity of the argument or exhibits.

i.  Plaintiffs' Historical Arguments

As a general matter, Plaintiffs contend that the Subject Lands were ceded by the historic Oneida Indian Nation "to the people of the State of New York forever" in 1788 and were located within an approximately 250,000-acre area that was transferred to the State by the "ancient Oneida tribe" in a series of transactions beginning in 1795.  Dkt. No. 237-1 at 5.  Since the 1800s, the area has been populated predominately by non-Indians.  Id.  Beginning in 1987, the OIN purchased land that the Oneida tribe had sold to the State in the late 18th or early 19th century.  By 2005, the OIN had purchased a total of 17,370 acres scattered throughout Madison and Oneida County.  Id.  (quoting Sherrill III, 544 U.S. at 202).  Plaintiffs claim that "[f]or the approximately two centuries between the Oneidas' sale of the land and the OIN's repurchase of the land, 'governance of the area in which the properties are located has been provided by the State and its county and municipal units.'"  Id.

In addressing the Carcieri issue, Plaintiffs urge the Court to look to the Agency decision Village of Hobart, Wisconsin v. Acting Midwest Regional Director, Bureaus of Indian Affairs, Interior Board of Indian Appeals, Docket Nos. 10-107, 10-091, 10-092.  See Dkt No. 237-1 at 22. Plaintiffs argue that the Court should analyze "the following specific factors: (1) Did the tribe retain trust lands which required federal supervision? (2) Did the federal government report the tribe's reservation and population in the 1933-1934 Annual Report of the Commissioner of Indians Affairs? (3) Did the tribe vote to adopt the IRA in 1934?"  Id. (citation omitted).  By failing to apply these factors and by generally remaining silent as to the OIN's tribal status in 1934, DOI – according to Plaintiffs – failed to apply the controlling legal standard.  Id. at 23.

As to the OIN's tribal status, Plaintiffs argue that the historical record is clear. "The official view of the DOI, from at least 1915 to 1941, was that the Oneida Indians in New York were not organized as a tribe." Id. at 26. Plaintiffs contend that following the forced displacement of the Oneida to Wisconsin in the nineteenth century and the Buffalo Creek Treaty of 1838,[13] the members of the Nation who remained were not officially organized and did not constitute a tribe. See id. at 27; see also U.S. v. Elm, 25 F. Cas. 1006, 1008 (N.D.N.Y. 1877) ("[The Oneida] tribal government has ceased as to those who remained in [New York] state. . . . [The designated chief's] sole authority consists in representing them in the receipt of an annuity. . . . They do not constitute a community by themselves, but their dwellings are interspersed with the habitations of the whites. In religion, in customs, in language, in everything but the color of their skins, they are identified with the rest of the population."). In further support of this proposition, Plaintiffs cite a DOI report prepared for Congress in 1914 that stated:

> The Oneidas also, by various treaties, sold all of their land, except about 350 acres to the State, and removed to the reservation in Wisconsin procured from the Menominee by treaty with the Federal Government. The 350 acres in New York belonging to the Oneidas have long since been divided into severalty under State law, and as a tribe these Indians are known no more in that State.

Id. (citation omitted).

Plaintiffs additionally draw the Court's attention to the litigation of United States v. Boylan, a case arising from the eviction of a group of Oneida from their homes in Oneida, New York and involving the validity of conveyances of land in the latter part of the nineteenth century. 265 F. 165 (2d Cir. 1920). In that case, the Department of Justice ("DOJ") had brought suit on

---

[13] See generally Sherrill III, 544 U.S. at 202, 216; Robert B. Porter, *Building a New Longhouse: The Case for Government Reform within the Six Nations of the Haudenosaunee*, 46 Buff L. Rev. 805, 836 (1998).

behalf of the evicted Onieda.  See generally id.  The District Court in Boylan made certain factual

"findings" as to the Oneida Indians and their relation to the historic Oneida Tribe, concluding that

the individuals involved in the matter before the court were a "remnant of the Oneida tribe."

United States v. Boylan, 256 F. 468, 495 (N.D.N.Y. 1919).  The court went on to identify "tribal

relations," described the evicted individuals as a "tribe" or "band," and referred to the land in

question as the remnants of the "Oneida Reservation."  See generally id.  The Boylan case,

therefore, ostensibly supports the proposition that the OIN had an ongoing relationship with the

Federal government at least up until 1920.

Plaintiffs argue, however, that DOI was not supportive of the holding in Boylan and did

not endorse the conclusion that "the Oneida Indians in New York were wards of the Federal

Government."  Dkt. No. 237-1 at 31.  Further "the unilateral action by the Department of Justice

on behalf of the Boylan Indians did not bring those Indians 'under federal jurisdiction' for

purpose of the IRA; for that to happen, the Department of the Interior must exercise jurisdiction

and control over trust lands or provide other services to the tribe."  Id. at 32.  In addition to

generally criticizing Boylan as an irrelevant outlier, Plaintiffs argue that

> the decision in Boylan – even if could establish eligibility on the part of those evicted
> Indians to receive benefits under the IRA (it did not) the OIN is not in a position to
> benefit from any such determination because the members of the OIN are not related by
> family history or social or political relationship to the Boylan Indians, as explained in the
> Beckham Report.

Id.

Plaintiffs further emphasize an alleged "referendum" by sixty-nine members of the OIN

conducted in 1935 that represented a vote not to be under federal jurisdiction via the IRA as

proof that jurisdiction was lacking in 1934.  See id. at 34; Dkt. No. 248-29.  According to

Plaintiffs' rationale, this vote should weigh against a finding of jurisdiction under the <u>Village of Hobart</u> framework.

Plaintiffs also cite a variety of historical sources for the proposition that the OIN had neither a reservation nor tribal organization in 1934, which Plaintiffs contend is further proof that a <u>Carcieri</u> inquiry must invalidate the ROD.  <u>See generally</u> Dkt. No. 237-1 at 34-36.  These claims are purportedly supported by a series of letters written in the 1930s and later by individuals who were alive and had knowledge of the OIN in this time period.[14]  <u>See generally</u> <u>id.</u> Plaintiffs further provide extensive citation to and quotations from the writings of a series of Commissioners of the Indian Affairs Office, meant to demonstrate a generally "hands off" approach to the indigenous peoples of New York.  <u>See generally</u> <u>id.</u> at 34-41.

### ii.   Defendants' and Defendant-Intervenor's Historical Arguments

Without submitting the same sort of extensive array of historical sources and supporting documentation,[15] Defendants and Defendant-Intervenor contend that the OIN was in fact (and as a matter of law) a tribe under federal jurisdiction in 1934.  As a global matter, in their briefings, Defendants and Defendant-Intervenor argue repeatedly that many of the exhibits that comprise

---

[14]  <u>See, e.g.,</u> Dkt. No. 249-2 (attaching a 1979 affidavit from a woman who claimed that "[i]n approximately 1930, I began an active pursuit of the Nation land claims. At that time and throughout my life, until 1948, the Oneida Nation was not formally organized in any government structure").

[15]  The Court notes and discusses *infra* Defendant-Intervenor's strenuous objection to Plaintiffs' introduction of myriad exhibits relating to the <u>Carcieri</u> issue that Plaintiffs had not previously presented for consideration in the ROD.  <u>See generally</u> Dkt. No. 270 at 44-47.  As will be discussed, the fact that these documents were raised first in front of the Court rather than the Agency weighs heavily in favor of a decision to remand.

Plaintiffs' proffered historical record are DOI internal documents or other materials that do not represent official departmental or governmental policy.  See, e.g., Dkt. No. 272 at 11 n.8.

Defendants argue, *inter alia*, that the Secretary "undisputedly" called for the OIN to vote on the IRA and that the vote in and of itself is dispositive proof in this matter.  See Dkt. No. 261 at 28-32.  Where Plaintiffs contend that the vote against application of IRA to the OIN by the OIN demonstrates a lack of jurisdiction, Defendants contend that the very fact that members of the OIN were able to vote on IRA *after* 1934 demonstrates that they were under federal jurisdiction *in* 1934.  See id.  As Defendants argue, "[t]he existence of federal jurisdiction over the tribe is a prerequisite for, not the result of, a vote called by the Secretary."  Id. at 30.

Where Plaintiffs argue that Boylan was anomalous and not indicative of the historical understanding of the Oneida's tribal status, Defendants emphasize the Boylan litigation as evidence that the federal government was acting on behalf of the OIN in the early twentieth century.  See id. at 33-36.  Such federal action, Defendants contend, creates a presumption in favor of jurisdiction, absent some other governmental action.  See id. at 33; see also Oneida Indian Nation of N.Y. v. City of Sherrill, 337 F.3d 139, 166 (2d Cir. 2003) ("Sherrill II") ("Once a tribe has been recognized, the removal of that recognition, like reservation diminishment or disestablishment, is a question for other branches of government").

Defendants also cite the Treaty of Canandaiga and treaty relationships between the Oneida and the U.S. government as evidence that federal jurisdiction existed prior to and – absent other clear governmental action terminating such relationships (which Defendants contend are

lacking) – at least up until 1934.[16]  Dkt. No. 272 at 11.  Defendant-Intervenor similarly argues

that "even without an IRA vote, there cannot be a material factual dispute about whether the

Oneida Nation qualifies as an Indian tribe under the IRA because the federal government entered

into several treaties with the Oneida Nation and there is no claim that the federal government's

relationship with the tribe was ever terminated by the political branches."[17]  Dkt. No. 270 at 44

(citation and footnote omitted).

       In addition, Defendant-Intervenor contends that the Second Circuit's decisions in Sherrill

II and Oneida Indian Nation of New York v. Madison County, 665 F.3d 408, 443-44 (2d Cir.

2011) preclude Plaintiffs' arguments that "the Oneidas ceased to exist at some point in the late

19th century."  See Dkt. No. 236-1 at 17; see also Oneida Indian Nation, 665 F.3d at 443 ("It

remains the law of this Circuit that 'the Oneidas' reservation was not disestablished") (quoting

Sherrill II, 337 F.3d at 167); Sherrill II, 337 F.3d at 167 ("this Court determined in Boylan in

1920 – between the time of the two letters in question [1916 and 1925] – that the Oneida tribe did

in fact exist").[18]

                    b.  *Remand to Address Jurisdiction*

                         i.  Legal Standard

_____

       [16]  Plaintiffs argue that the "historic Oneida Indian Nation" that signed the treaty and that
populated central New York in the eighteenth and early nineteenth century is distinct from the
present day OIN involved in the instant matter.  See Dkt. No. 237-1 at n.3.

       [17]  See generally FELIX S. COHEN, FEDERAL INDIAN LAW § 3.02[5], at 143 (2005 ed.).

       [18]  While, in Sherrill III, the Supreme Court reversed the Second Circuit's decision in Sherill
II, the Second Circuit has subsequently stated that certain elements of the earlier decision pertaining
to the alleged "disestablishment" of the Oneida reservation and to the history of the nation "remain[]
the law of this Circuit. " See Oneida Indian Nation, 665 F.3d at 443.

A court reviewing the decision of an agency "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.  Rather, the proper course, except in rare circumstances not present here, is to remand to the agency for additional investigation or explanation."  Gonzales v. Thomas, 547 U.S. 183, 186 (2006) (quoting INS v. Ventura, 537 U.S. 12, 16 (2002)) (internal citations omitted); see also Negusie v. Holder, 555 U.S. 511 (2009); Matadin v. Mukasey, 546 F.3d 85, 93 (2d Cir. 2008) ("Because the matter requires determining the facts and because the agency has not yet determined the facts utilizing the appropriate burden of proof, we follow the ordinary remand rule and vacate and remand to the agency for further factual findings.") (internal quotations and citations omitted).

The "basic legal principles" that support the ordinary remand rule ensure that an "agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides."  Thomas, 547 U.S. at 186-87 (internal quotations omitted).  Only in "rare circumstances" is remand not the appropriate course when "additional investigation or explanation" is necessary at the agency level.  Ventura, 537 U.S. at 16; Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985); Port of Portland v. United States, 408 U.S. 811, 842 (1972) (citing SEC v. Chenery Corp., 318 U.S. 80, 87-88 (1943)).  When a "matter requires determining the facts and deciding whether the facts as found fall within a statutory term," Gonzalez, 547 U.S. at 186, remand to the agency is appropriate.  Ventura, 537 U.S. at 17; Gonzalez, 547 U.S. at 186-87.

Under "general principles of futility," however, a court need not remand a case to an

agency for further fact finding or analysis "if the remand would be pointless because it is clear

that the agency would adhere to its prior decision in the absence of error." Alam v. Gonzales,

438 F.3d 184, 187-88 (2d Cir. 2006) (quoting Xiao Ji Chen v. U.S. Dep't of Justice, 434 F.3d

144, 161 (2d Cir. 2006). "The grounds upon which an administrative order must be judged are

those upon which the record discloses that its action was based." Chenery Corp., 318 U.S. at 87.

However, "a reversal and remand are [not] required each and every time an administrative agency

assigns a wrong reason for its action." NLRB v. American Geri-Care, Inc., 697 F.2d 56, 64 (2d

Cir. 1982) (citing NLRB v. Wyman-Gordon Co., 394 U.S. 759, 766 n.6 (1969)).  Rather,

"reversal and remand [are required] only where there is a significant chance that but for the error,

the agency might have reached a different result." Id.

### ii.  The Parties' Opposition

While there can be no question but that the parties disagree strongly as to the application

of Carcieri and the historical record as it relates to the OIN and its relationship with the federal

government, the parties also contend at numerous times that any remand to the BIA on this issue

would be futile.[19]  See, e.g., Dkt. Nos. 259 at 28-29 ("The parties agree that if the Court remands

---

[19]  While, for the sake of preventing redundancy and unnecessary summarization, this
Memorandum-Decision and Order does not contain an exhaustive analysis of the parties' arguments
in the other related cases, the Court notes that the Carcieri issue is addressed in several of the
companion cases.  See, e.g., Central NY Fair Business Association et al. v. Salazar et al., No.
6:08-CV-660 (LEK/DEP), Dkt. Nos. 90-1, 91-1, 97; City of Oneida, New York v. Kempthorne et
al., No. 5:08-CV-00648 (LEK/DEP), Dkt. No. 49-15; Town of Verona et al. v. Salazar et al., No.
6:08-CV-00647 (LEK/DEP), Dkt. Nos. 43-11, 53.  Particularly, the Court notes that on at least two
occasions, in the course of discussing the Carcieri jurisdictional question, Plaintiffs in other related
cases did not argue that remand would be futile and instead argued that it would be the appropriate
course of action.  See, e.g., Central NY Fair Business Assoc., Dkt. No. 97 at 12 ("if this Court
denies the federal motion for summary judgment on the basis that the ROD did not make the

the Carcieri issue to DOI, the Secretary will not change the position taken in the ROD, rendering

a remand futile"); 260 at 10; 261 at 13.

Plaintiffs, for their part, argue that remand would be futile because DOI is biased in favor

of the OIN:

> the DOI cannot be trusted to render a fair determination concerning the OIN's eligibility
> to have land taken into trust, and would doubtlessly engage in a result-oriented analysis to
> find the OIN "under federal jurisdiction," in further defiance of the Supreme Court's
> holding in Carcieri. Thus, a remand to this agency would be both futile and inappropriate.

Dkt. No. 237-1 at 25-26 (citation omitted); see also Dkt. No. 259 at 28-29.  In their most recent

briefing, however, Plaintiffs appear to acknowledge that a remand might be appropriate:[20]

> If the Court concludes that it cannot reach the [Carcieri] issue based on the complete
> record developed on these motions, then the Court must remand to the agency; and when
> it does so, it should instruct the DOI to assemble a record (including the materials
> submitted by Plaintiffs) in deciding the issue.

Dkt. No. 271 at 14.  However, Plaintiffs suggest that any remand will be futile and that a

construction of a complete record would be useful only "so that the materials may be considered

by the Court *after the DOI simply confirms the Determination on remand*."  Id. (emphasis added).

---

appropriate determinations of whether the OIN was a tribe eligible for the benefits of the IRA per
the Carcieri decision that the appropriate result is to vacate the ROD as incomplete or inadequate
and remand the case back to the BIA to make the initial administrative determinations"); Town of
Verona, Dkt. No. 53 at 2-3.

[20]  Plaintiffs also appear to have suggested earlier in the litigation that a remand would be
appropriate if the Court finds that further investigation is necessary to resolve the Carcieri issue.
See Transcript of Motion hearing held March 17, 2010 (Dkt. No. 184) at 65, 70 ("Judge Kahn also
has another issue if the record doesn't effectively address that and he concludes that it should have,
then he may, instead of doing discovery, more likely in fact *this is what the law suggests you
typically do*, if he concludes the agency did not address it, *is you remand it to the agency*")
(emphasis added).

26

Defendant-Intervenor also claims that remand would be futile but contends that "the true reason that it would be futile to remand is that there is only one possible way for DOI to answer the [Carcieri] question."[21] Dkt. No. 260 at 10. Similarly, Defendants argue that "the Court should hold the Oneidas were under federal jurisdiction in 1934 as a matter of law. For the same reason, a remand of this case to allow the Department to consider whether the Oneidas were under federal jurisdiction in 1934 would be futile." Dkt. No. 261 at 13; see also Dkt. No 240-1 at 27 (stating that "there is no significant chance that the Secretary will conclude that the Oneidas were not a recognized tribe under federal jurisdiction in 1934").

### iii.  Reasons for Remand

The Court duly notes the parties' objections to a decision to remand this matter. Further, the Court is aware that this matter has already languished too long before various tribunals and is mindful that a return to the agency level would extend the litigation process and presumably entail additional expenditures by the parties. That being said, upon thorough consideration of the submissions before it, the Court concludes that the proper course of action is to remand this matter to the Agency so that it may consider the Carcieri issue and arrive at an informed decision. In reaching this result, the Court firmly believes that further analysis by DOI is in the interests both of ensuring that a just and accurate result is reached *and also* of serving judicial economy.[22]

---

[21]  See also Dkt. No. 236-1, at 10 n.6 ("Put another way, a remand to DOI to address this point would be an 'idle and useless formality[,]' because the point the agency would be required to address is already clear as a matter of law") (quoting Wyman-Gordon Co., 394 U.S. at 766 n.6; citing Xiao Ji Chen v. U.S. Dep't of Justice, 471 F.3d 315, 338 (2d Cir. 2006)) (alteration in the original).

[22]  Cf. Ford Motor Co. v. NLRB, 305 U.S. 364, 373 (1939) ("The jurisdiction to review the orders of [the agency] is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its

In this matter, the Court has been presented with voluminous briefs and memoranda of law on both sides of the Carcieri issue – an issue that was not addressed by DOI in the context of its ROD. The arguments advanced by the parties seem to present the Court with three different ways in which to proceed:[23] (1) the Court could conclude that because the Carcieri jurisdictional issue and the historical arguments advanced are not reflected in the ROD, such arguments have been waived or are not appropriately considered in the course of agency review; (2) the Court could address the Carcieri jurisdictional issue *de novo* and rule on it as a matter of law; or (3) the Court could remand this matter to DOI so that the Agency might enter a new ROD that addresses the jurisdictional question raised by Carcieri, and which the Court could subsequently review in the case of appeal.[24] For the following reasons, the Court concludes that a remand is appropriate in this case.

### (a) *Necessity of Addressing Jurisdiction under Carcieri*

First, the Court concludes that the jurisdictional analysis raised by the Supreme Court's interpretation of the IRA in Carcieri must be addressed in this matter. To the extent that the IRA was ambiguous at the time of the ROD, the Supreme Court has since clarified its interpretation of the statute in Carcieri. See 555 U.S. at 395-96. As stated *supra*, the operative question for a

---

relief to the exigencies of the case in accordance with the equitable principles governing judicial action").

[23] The Court notes other alternative course of action may exist, but it finds these three to be the options most clearly contemplated by the parties in their briefings.

[24] For the sake of clarity and conciseness, in addressing these three potential course of action, the Court will analyze Option One (ignoring the Carcieri issue as either waived, inappropriate, or unnecessary) separately and will analyze Option Two (conducting a *de novo* Carcieri jurisdictional inquiry) and Option Three (remanding to DOI to conduct such an inquiry) together.

court or the Agency in determining whether trust authority may properly be exercised is whether

the tribe in question was federally recognized and under federal jurisdiction in 1934 as opposed

to whether the tribe was federally recognized and under federal jurisdiction at the time of the trust

decision.  See id.  Such a jurisdictional analysis is clearly absent from the ROD.[25]  See generally

ROD.  The Court notes that such an omission and the failure of parties to address the issue of the

1934 tribal status of the OIN fully below are easily attributable to the fact that Carcieri had not

been decided at the time the ROD was issued in 2008.  However, even if it were not arbitrary and

capricious in 2008 for DOI to resolve the instant matter without addressing the jurisdictional

question in the method provided by Carcieri, at this point in time, the ROD is deficient without

such an analysis.[26]

Viewed through the lens of Carcieri, the instant matter presents the Court with an

ostensibly straightforward syllogism: (1) in order for DOI to have placed the land into trust for

the OIN lawfully, DOI must have had authority granted by the IRA, see generally Sherrill III, 544

_____

[25]  Plaintiffs contend that in their initial comments to DOI, they "alerted the DOI that section 465 of the [IRA] does not apply to the OIN because, *inter alia*, there were serious questions regarding whether the OIN was a recognized tribe under federal jurisdiction in 1934."  Dkt. No. 237-1 at 9 (citation omitted).  However, as Defendants and Defendant-Intervenor accurately observe, this "alert" appeared in the form of a footnote.  See id. (citing a footnote from the initial comment); Dkt. No. 272 at 4 (arguing that "Plaintiffs' sole effort to put the Department on notice of this claim was a footnote that offered an aside to their main argument about whether the Indian Land Consolidation Act applied to the Oneidas") (citation omitted).  Given that scores of pages of briefing and numerous exhibits have been presented to the Court on this issue, the Court hardly believes that this issue was seriously presented to or considered by DOI during the preparation of the ROD.

[26]  That is, this is not a situation in which one party seeks to apply a rule announced later in time to a matter decided earlier.  See, e.g., Stogner v. California, 539 U.S. 607 (2003).  Rather, the Carcieri decision represents the authoritative interpretation of the IRA.  Therefore, in reviewing a matter that arose under the IRA prior to February 24, 2009, when the Supreme Court decided Carcieri, the Court must still use the Carcieri Court's IRA analysis as the paradigm for its inquiry.

29

U.S. at 220-21; (2) in order for DOI to have authority under the IRA to place land into trust for a given tribe, that tribe must have been under federal jurisdiction in 1934; Carcieri, 555 U.S. at 395-96; therefore (3) in order for DOI to have placed the land into trust for the OIN lawfully, the OIN must have been under federal jurisdiction in 1934.  See id.  In order to determine that the land was lawfully placed into trust in this matter, therefore, it is clear that the Court or the Agency must resolve this threshold inquiry into the 1934 tribal status of the OIN.

While the Court is mindful of the "record rule"[27] and of the fact that many of the sources and arguments present in the briefs currently before it were not provided to DOI or included in the ROD,[28] the Court also concludes that the shift in the legal landscape of the IRA's application

---

[27] See, e.g., Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 14 (2d Cir. 1997) ("Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision") (citing Fla. Power, 470 U.S. at 743-44); Tummino v. Torti, 603 F. Supp. 2d 519, 542-43 (E.D.N.Y. 2009) ("The rationale behind the 'record rule' is that a reviewing court, 'in dealing with a determination or judgment which an administrative agency alone is authorized to make,' should not conduct a de novo trial, review materials not before the agency when the decision was made, or substitute its opinion for that of the agency" (citing Chenery, 332 U.S. at 196) (internal citation omitted).

[28] Indeed, Defendant-Intervenor objected to Plaintiffs' introduction of myriad exhibits relating to the Carcieri issue that Plaintiffs had not previously presented for consideration in the ROD. See generally Dkt. No. 270 at 44-47.  "Plaintiffs could have submitted to DOI the documents that they have submitted to this Court," argues Defendant-Intervenor.  Id. at 45.

> Plaintiffs could also have hired a historian to submit a report to DOI, just as they hired an economist to submit a report on the Nation's ability to pay property taxes. Plaintiffs cannot avoid the deference that the Court would have given to DOI's application of the "under federal jurisdiction" standard to the facts by withholding material from the agency so that it can be used for the first time in an APA challenge.  Moreover, Plaintiffs (or their expert) cannot cherry-pick extra-record documents, disregarding everything that contradicts their claim, and then assert that their customized record supports their claim.

Id. at 45-46.  However, the Court again notes that the Supreme Court's interpretation of the IRA in Carcieri had not been announced at the time of or prior to the entry of the ROD, meaning that in 2008 it may not have been clear that the relevant inquiry for DOI and for interested parties was the tribal status of the OIN in 1934.

Further, while the Court is mindful of the "record rule" and notes Defendant-Intervenor's

heralded by <u>Carcieri</u> necessitates a reasoned and informed analysis of the jurisdictional question. <u>Cf.</u> <u>Ford Motor Co.</u>, 305 U.S. at 373 ("while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action").

### *(b)  Proper Point of Inquiry: Court or Agency*

Having concluded that the jurisdictional issue arising under <u>Carcieri</u> must be addressed in this matter, the Court must next determine whether the Court may conduct this analysis *de novo* or whether the Court should instead remand the matter to DOI for resolution.  In making this decision, the Court emphasizes that DOI (via the BIA) has specific expertise that the Court lacks. <u>See, e.g.</u>, <u>Golden Hill Paugussett Tribe of Indians v. Weicker</u>, 39 F.3d 51, 59 (2d Cir. 1994) (endorsing "the resolution of technical questions of facts through the agency's specialized expertise"); <u>United Tribe of Shawnee Indians v. United States</u>, 253 F.3d 543, 551 (10th Cir. 2001) ("Determining whether a group of Indians exists as a tribe is a matter requiring . . . specialized agency expertise"); <u>BGA, LLC v. Ulster County, N.Y.</u>, No. 1:08-CV-149, 2010 WL 3338958, at *9 (N.D.N.Y. Aug. 24, 2010); <u>New York v. Shinnecock Indian Nation</u>, 280 F. Supp.

---

concern about Plaintiff's circumventing the deferential standard of review afforded to agencies, the Court's decision to remand the case should prevent any such perceived gamesmanship and guarantee that the respect for agency expertise and institutional competence implicit in administrative law is preserved.  <u>See</u> Dkt. No. 184 at 74 (counsel expressing concern that "the APA protects the agency from having it in effect rendered neutralized by a plaintiff who could then go, okay, now let's throw this entire record before the court and then the court can decide instead of – that would in effect render the agency a nonentity because everyone would just be biding their time until the agency finishes a decision so then the court could take a crack at it de novo").  That is, the Court *is not* deciding on the <u>Carcieri</u> issue *de novo*.  The Agency *and not* the Court will review the exhibits provided by Plaintiffs, to the extent the Agency finds relevant and necessary, and – in case of appeal – the Court will apply the prescribed deferential standard to the ROD below.

2d 1, 8 (E.D.N.Y. 2003).[29]   Indeed, one of the primary reasons that courts defer to and that so

much responsibility is delegated to agencies is that agencies possess unique expertise and a

special set of skills that allows them to address certain statutory claims both accurately and

efficiently.  See, e.g., Fed. Mar. Bd. v. Isbrandtsen Co., 356 U.S. 481, 498 (1958) ("It is

recognized that the courts, while retaining the final authority to expound the statute, should avail

themselves of the aid implicit in the agency's superiority in gathering the relevant facts and in

marshaling them into a meaningful pattern"); Far East Conference v. United States, 342 U.S. 570,

574-75 (1952) ("a principle, now firmly established, that in cases raising issues of fact not within

the conventional expertise of judges or cases requiring the exercise of administrative discretion,

agencies created by Congress for regulating the subject matter should not be passed over"); Ellis

v. Tribune Television Co., 443 F.3d 71, 81 (2d Cir. 2006) (refering to the ability of "courts to

take advantage of an agency's specialized knowledge, expertise, and central position within the

regulatory regime") (citation and internal quotation marks omitted);  MCI Telecomms. Corp. v.

Teleconcepts, Inc., 71 F.3d 1086, 1103 (3d Cir. 1995) (discussing situations in which a "dispute

involves issues that are clearly better resolved in the first instance by the administrative agency

charged with regulating the subject matter of the dispute").[30]

---

[29]  See generally Melissa L. Koehn, *Civil Jurisdiction: The Boundaries Between Federal and
Tribal Courts*, 29 ARIZ. ST. L.J. 705 (1997) (discussing the Tribal Exhaustion Doctrine and the
importance of BIA expertise to the rationale for the Doctrine's application).

[30]  Cf. James v. United States Department of Health and Human Services, 824 F.2d 1132,
1138 (D.C. Cir. 1987) ("the Department has been implementing its regulations for eight years and . .
. it employs experts in the fields of history, anthropology and genealogy, to aid in determining tribal
recognition.  This, in our opinion, weighs in favor of giving deference to the agency by providing it
with the opportunity to apply its expertise.  Moreover, the factual record developed at the
administrative level would most assuredly aid in judicial review should the parties be unsuccessful
in resolving the matter; in the event that the dispute is resolved at the administrative level, judicial

While the Court is certainly an appropriate locus for the interpretation of contested federal statutes, see Isbrandtsen Co., 356 U.S. at 498, in this matter the question presented by the parties and by the Supreme Court's decision in Carcieri is one that requires a detailed analysis of contested, factually-laden historical accounts.[31]  The Court notes that an element of these accounts is an array of federal case law, which the Court is of course in prime position to address.[32]  That being said, in order to rule as a matter of law on the jurisdictional question raised by Carcieri, the Court would also have to construct an accurate historical record, necessarily crediting and discounting, respectively, various learned sources.[33]  There is an institution specifically designed and coordinated to have expertise in the social, cultural, political, and legal history of the indigenous peoples of the United States.  This institution is not the Court.  It is the Bureau of Indian Affairs.

---

economy will be served. All of these facts weigh in favor of requiring exhaustion in this case.").

[31]  The Court notes Plaintiffs' argument that "this Court can and should decide this question rather than remand the IRA eligibility issue to the Secretary.  The issue is principally one of law, with the defining consideration being the meaning of 'under federal jurisdiction' in the IRA. That issue can be answered best by the Court. . . . this question [is] a legal one suited for the court."  Dkt. No. 237-1 at 24.  However, as discussed supra and infra, the Court concludes that the legal answer that must be reached in this case relies heavily on a factually-intensive inquiry (the uncontested nature of which the Court remains unsure) and as such is more properly dealt with by the Agency as an initial matter.

[32]  The Court also notes, however, that the parties also rely substantially on earlier BIA opinions and Agency precedent, see, e.g., Dkt. No. 237-1 at 22-23, with which the Agency is certainly more familiar than the Court.

[33]  To this end, the court notes Defendant-Intervenor's compelling arguments that rest on Oneida Indian Nation of New York v. Madison County.  See Dkt. No. 236-1 at 17.  But, for the reasons cited supra and infra, concludes that remand to perform the necessary factual investigation before applying this precedent is the proper course of action.

33

Given the lack of a record below on the Carcieri jurisdictional question and the progressively increasing breadth of historical argument raised in the parties briefing,[34] the Court concludes that further investigation in this case is necessary. Only in "rare circumstances" is remand not the appropriate course when "additional investigation or explanation" is necessary at the agency level. Ventura, 537 U.S. at 16. Therefore, because such circumstances are lacking here, "the proper course . . . is to remand to the agency for additional investigation or explanation." Gonzales, 547 U.S. at 186 (quoting Ventura, 537 U.S. at 16) (internal citations omitted). The determination of whether the OIN was under federal jurisdiction in 1934 "requires determining the facts and deciding whether the facts as found fall within a statutory term." Gonzalez, 547 U.S. at 186. On remand, the "agency can bring its expertise to bear upon the matter; it can evaluate the evidence; it can make an initial determination; and, in doing so, it can, through informed discussion and analysis, help a court later determine whether its decision exceeds the leeway that the law provides." Thomas, 547 U.S. at 186-87 (internal quotations omitted).[35]

---

[34] The volume of argument on and engagement with this issue has increased markedly over time. Compare ROD (not addressing the issue at all), with Dkt-No. 236-1 at 9-18 (devoting fewer than nine pages to the issue), with Dkt. No. 237-1 at 19-48 (conducting a twenty-nine page historical analysis of the issue), with Dkt. No. 259 at 8-29 (including over twenty additional pages on the issue), with Dkt. No. 261 at 10-37 (devoting twenty-seven pages to the Carcieri inquiry), with Dkt. No. 271 at 5-42 (devoting almost half of a ninety page brief to the issue).

[35] At oral argument on an earlier motion before the Honorable David E. Peebles, United States Magistrate Judge, Judge Peebles asked the parties: "Why shouldn't the agency's expertise be called on first, if this [jurisdiction under the IRA] is truly an issue that has surfaced since the . . . issuance of the ROD, why shouldn't Judge Kahn remand the matter to the agency for further exploration of that issue?" Dkt. No. 184 at 64. Having reviewed the responses provided on the transcript of the oral arguments alongside the briefings currently before the Court, the Court finds no proferred answer that satisfactorily answers Judge Peebles's question and convinces the Court that a remand is not the appropriate course of action.

<u>iv.</u>  <u>Futility</u>

Finally, the Court does not find the parties' futility arguments to be compelling.  First, Plaintiffs' insistence that DOI is operating as a "captured" agency,[36] making its decision on remand a foregone conclusion, <u>see, e.g.,</u> Dkt. Nos. 260 at 10; 261 at 13, is neither borne out by the record nor justifies a refusal to remand if remand would otherwise be appropriate.  As discussed further *infra* in the context of Plaintiffs' claims of prevailing bias in the Agency's handling of the OIN and the matters before the Court, the Court is not prepared to find that the Agency is inherently and incurably biased, such that it is incapable of following the Court's instructions and analyzing the <u>Carcieri</u> issue.  Indeed, as Plaintiffs themselves note, even were DOI to conclude on remand that the <u>Carcieri</u> decision did not alter the Agency's ability to take land into trust for the OIN, the Court – and the parties – would then have the benefit of a full record on the <u>Carcieri</u> issue, a record that could, of course, be reviewed by the Court to ensure both that the resolution of the jurisdictional question was not arbitrary and capricious and also that such a determination was not fatally infected with bias (so as to make it arbitrary and capricious).  <u>See</u> <u>Tummino v. Torti</u>, 603 F. Supp. 2d 519, 542 (E.D.N.Y. 2009) ("proof of subjective bad faith by [agency decision-makers], depriving a [petitioner] of fair and honest consideration of its proposal, generally constitutes arbitrary and capricious action") (quoting <u>Latecoere Int'l, Inc. v. U.S. Dept. of Navy</u>, 19 F.3d 1342, 1356 (11th Cir. 1994); citing <u>James</u>

---

[36]  On agency capture theory, <u>see generally</u>, David Dana & Susan Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473, 497-98 (1999); Mark Seidenfeld, *A Civic Republican Justification for the Bureaucratic State*, 105 Harv. L. Rev. 1511, 1565-70 (1992); Samuel P. Huntington, *The Marasmus of the ICC: The Commission, the Railroads, and the Public Interest*, Yale L. J. 467-509 (1952).

Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) (bad faith is "material to

determining whether the Government acted arbitrarily")).

Carcieri is undoubtedly the law of the land, and the Court is bound by the Supreme

Court's interpretation of the IRA therein and must ultimately assess DOI's ROD through this

interpretive lens.[37]  See 555 U.S. 379, 395-96.   On remand, therefore, the Court instructs DOI to

assemble a record on the Carcieri issue and to consider this question in issuing a final ROD.

Further, as addressed *infra* in the Court's discussion of the bias issue, DOI should be mindful of

the paramount need for impartiality going forward.  The Court is in no way prepared to accept

Plaintiffs' apparent request that the Court conclude *a priori* that DOI will ignore these

instructions.  See Ali v. Reno, 829 F. Supp. 1415, 1426 (S.D.N.Y. 1993) ("'the efficient use of

scarce judicial resources is promoted by remand', as it relieves the courts of the burden of having

to 'decide whether in hindsight the positives might so outweigh the negatives as to succeed in

altering the result reached by the INS.' . . . .  If the matter is remanded with instructions that the

INS comply with its own regulations, 'then the determination whether a petitioner merits . . .

relief is properly left to the wisdom and expertise of the INS in the first instance") (quoting

Montilla v. I.N.S., 926 F.2d 162, 169 (2d Cir. 1991)).

---

[37]  As the Georgia Supreme Court clearly framed the issue:
> While judicial deference is afforded an agency's interpretation of statutes it is charged with enforcing or administering, the agency's interpretation is not binding on the courts, which have the ultimate authority to construe statutes. . . . It is the role of the judicial branch to interpret the statutes enacted by the legislative branch and enforced by the executive branch . . ., and administrative rulings will be adopted only when they conform to the meaning which the court deems should properly be given.

Handel v. Powell, 670 S.E.2d 62, 63, 65 (Ga. 2008); see also David E. Shipley, *The* Chevron *Two-Step in Georgia's Administrative Law*, 46 GA. L. REV. 871, 910-11 (2012) (discussing Handel and the interpretive role of the courts in agency matters under Chevron).

Second, as to Defendants' and Defendant-Intervenor's arguments that remand would be futile because the Carcieri issue is clear as a matter of law and that DOI could not possibly find otherwise, the Court remains unconvinced.  By this stage in the litigation, much ink has been spilled by the parties on the historical relationship between the OIN, the federal government, and the ownership and inhabitation of large swaths of land in central New York.  The parties have also provided the Court with extensive supplementary historical sources as well as ostensibly authoritative historical accounts that purport to support divergent positions on the question of the OIN's status as a federally-recognized tribe in 1934.  In short, as is generally the case in situations where there are opposing motions for summary judgment (and also in situations where historians disagree as to the correct account of past events), the conflicting parties each insist that they have presented the only correct interpretation and any alternative is clearly erroneous.  Here, each party has offered to guide the Court through the treacherous morass of history and precedent that surrounds the instant matter, while admonishing that any alternate path leads to certain ruin.

Based upon the record before the Court and the daunting task of excavating and explicating historical understanding that the Court has undertaken, however, the Court is not convinced that the correct path is so obvious, that the Carcieri issue is so clearly resolved, or that any analysis so clearly favors Defendants and Defendant-Intervenor as to make a remand to the Agency an "idle and useless formality."  Wyman-Gordon Co., 394 U.S. at 766 n.6.  As discussed, the Carcieri issue was not addressed at the agency stage, and the jurisdictional question is similarly absent from the ROD.[38]  Therefore, the briefing presented to the Court on this issue at

_____

[38]  As also noted, *supra*, referring to DOI addressing the jurisdictional question posed by Carcieri in its ROD is somewhat anachronistic, given that the Carcieri question itself – as a judicially-announced rule of interpretation, rather than a concept that the agency of the parties might

the summary judgment stage represents the first major treatment of the jurisdictional question in this matter.  It is clear from a review of all the submissions that not only are the parties at odds over whether the OIN was under federal jurisdiction in 1934, but also that each party has amassed a wealth of authority in support of its conclusion.

As discussed *supra*, determining that the OIN was under federal jurisdiction in 1934 "requires determining the facts and deciding whether the facts as found fall within a statutory term." Gonzalez, 547 U.S. at 186.  The Court concludes that the complicated and evolving historical arguments presented in the parties briefs are hardly clear.  Instead of being futile, therefore, a remand to the Agency will allow the "agency [to] bring its expertise to bear upon the matter; . . . evaluate the evidence; . . . make an initial determination; and . . . help a court later determine whether its decision exceeds the leeway that the law provides." Thomas, 547 U.S. at 186-87 (internal quotations omitted).

Therefore, the Court finds that a remand to DOI to establish a record on and determine the outcome of the jurisdictional question raised by Carcieri is the proper course of action at this point.[39]

### 2. Remaining Counts

As the extensive briefings and procedural history in this matter indicate, the IRA jurisdictional question raised by the Carcieri decision and the overarching question of bias and

_____

have considered – was not decided until after the ROD was entered.

[39]  As noted, the parties have provided extensive arguments and exhibits relating to this issue.  Mindful of the deference owed to agencies, see, e.g., Overton Park, 401 U.S. at 416; Chevron, 467 U.S. at 844; Natural Res. Def. Council, 658 F.3d at 215, the Court notes that in reaching its decision, the Agency may of course use its own sound judgment to determine what sources are relevant and necessary to its analysis.

the integrity of the Agency's decision-making process are hardly the only issues before the Court. Indeed, Plaintiffs raise a slew of arguments – strongly opposed by Defendants and Defendant-Intervenor – that challenge the ROD as arbitrary and capricious and assert various statutory claims. See generally Dkt. Nos. 1, 19, 94. While the Court has reviewed these outstanding issues, because the Court remands this matter so that DOI may determine if it has jurisdiction over the OIN under the IRA, the Court concludes that it would be improper to address the remaining arguments raised by the parties at this time.

Under Article III of the United States Constitution, the jurisdiction of federal courts is limited to "cases" or "controversies," as distinguished from advisory opinions. See, e.g., U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446 (1993); Crawley v. U.S., 417 F. App'x 94, at *1 (2d Cir. 2011); U.S. v. Leon, 203 F.3d 162, 164 (2d Cir. 2000); Olin Corp. v. Consol. Aluminum Corp., 5 F.3d 10, 17 (2d Cir. 1993); Letter from Chief Justice John Jay and the Associate Justices to President George Washington (August 8, 1793), 3 CORRESPONDENCE & PUBLIC PAPERS OF JOHN JAY 488-89 (Henry P. Johnston ed. 1891). If DOI were to decide that it did not have land-trust jurisdiction over the OIN, all remaining claims before the Court would necessarily become moot, rendering any decisions on the claims superfluous and unnecessary to the resolution of the case or controversy.[40]

---

[40] Cf. Joan Steinman, *After* Steel Co.*: "Hypothetical Jurisdiction" in the Federal Appellate Courts*, 58 WASH. & LEE L. REV. 855 (2001) (discussing and critiquing the Supreme Court's forceful rejection in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998) of the practice of exercising "hypothetical jurisdiction" and of addressing further issues when a threshold inquiry has not been met).

As a result, common sense weighs heavily against a foray into the merits of these claims. Taking additional time to address such issues is not in the best interests of the parties or the Court. Therefore, the Court reserves decision on the remaining arguments at this point.

### 3. Bias Claims

Despite its conclusion that the remaining counts should not be addressed at this point in the litigation, in the interests of justice, judicial economy, and ensuring that the Court is not remanding this matter futilely to a biased decision-maker, the Court briefly addresses Plaintiffs' claim that DOI acted with improper bias in violation of both the due process clause of the Fifth Amendment and the APA. SASC ¶¶ 163-176.

Agency action may be vacated by a federal court for reasons of bias or improper influsence which "cause[d] the agency's action to be influenced by factors not relevant under the controlling statute." Tummino, 603 F. Supp. 2d at 544 (citing Town of Orangetown v. Ruckleshaus, 740 F.2d 185, 188 (2d. Cir. 1984). Agency decisions enjoy a presumption of regularity. USPS v. Gregory, 534 U.S. 1, 10 (2000).

In their Second Amended Complaint, Plaintiffs allege: (a) that Malcom Pirnie, Inc., the contractor that prepared the EIS for DOI, was biased; (b) that DOI's response to FOIA requests shows bias; and (3) that the OIN "dominated the EIS process" by hiring a former DOI and DOJ attorney to represent them. SASC ¶¶ 166-174. In their Response to Defendants' and Defendant-Intervenor's Motions for summary judgment, Plaintiffs articulate a multitude of additional facts from the Administrative Record to support their claim that the decision-making process was infected with bias at various points. Dkt. No. 259 at 49-56.

Without going into great detail at this stage, the Court notes that – as Judge Peebles previously found – many of these purported instances of bias "relate directly to the merits of the [P]laintiffs' claim that the DOI's determination was not supported by the record, and instead was arbitrary and capricious, or contrary to law." Dkt. No. 183 at 39. Some only represent instances where the Agency decided against Plaintiffs on one issue or another or are duplicative of other, extensively-briefed APA claims before the Court. See, e.g., Dkt. No. 259 at 51 (DOI "[i]gnored long-standing DOI policy not to take land into trust for tribes who are self-sufficient and can manage their own affairs."), 52 (DOI erroneously applied on-reservation standard rather than off-reservation standard). These claims really go to the merits of the APA challenge. Indeed, they appear to amount to substantive objections to DOI's legal judgments and decision-making procedure more than they do to the impartiality of the Agency.

To the extent that Plaintiffs assert claims of improper outside influence on agency decision-makers – namely, the claim that James Cason, Associate Deputy Secretary of the DOI, was improperly influenced by OIN lobbyist Thomas Sansonetti – the Court finds that these claims do not warrant a decision that DOI cannot be trusted to issue an unbiased opinion on the jurisdictional question.[41]  "'To support a claim of improper political influence on a federal administrative agency, there must be some showing that the political pressure was intended to

_____

[41]  The Court acknowledges Magistrate Judge Peebles's Decision and Order allowing an extra-record deposition of James Cason based on Plaintiffs having made "a sufficient showing to warrant limited discovery on the issue of bias and bad faith." Dkt. No. 183 at 44. The Court affirmed this decision on appeal under a "clearly erroneous" standard, while noting that "[t]he Court agrees with the Federal Defendants that other APA cases where extra-record discovery has been granted often involve stronger preliminary evidentiary bases of bad faith or improper motive than that at the bar." Dkt. No. 196 at 13. Although Plaintiffs made a sufficient showing on this question to warrant limited additional discovery, the question currently before the Court – whether the Agency is so biased that remand would be futile – clearly faces a significantly higher threshold.

and did cause the agency's action to be influenced by factors not relevant under the controlling

statute.'" Schaghticoke Tribal Nation v. Kempthorne, 587 F.3d 132, 134 (2d Cir. 2009) (quoting

Ruckelshaus, 740 F.2d at 188.  While DOI must of course limit its consideration on remand to

factors relevant under the controlling statutes, the Court simply does not find any basis to

conclude that DOI is unable to do so.

###   B.  Related Cases

As stated at the outset of this Memorandum-Decision and Order, in the interests of

judicial economy, the Court has consolidated these cases for purposes of the instant matter and

the decision to remand.  Further, as discussed *supra*, the claims and arguments raised by the

various parties are not entirely congruent and are not entirely represented in the extensive briefing

for State v. Salazar.  That being said, the Court does not find it necessary or appropriate at this

time to delve deeper into the independent grounds for summary judgment – or remand –

advanced in these companion cases.

Each of these cases emanates from the same legal and factual nucleus: the ROD

embodying the decision of DOI to take approximately 13,000 acres of land in central New York

into trust for the OIN.  Therefore, each of these cases is predicated on the existence of the ROD

and DOI's land-trust determination.  Put simply, if there had been no such grant, there would be

no such claims.

Returning, then, to the syllogism that framed the Court's analysis of the Carcieri

jurisdictional issue in State v. Salazar, for each of these claims in each of these case to be before

the Court, DOI must have had land-trust jurisdiction over the OIN.  Therefore, the threshold

question that the Court addressed in the context of State v. Salazar is the same one that the Court

must address in each of these separate matters.  While several of these cases raise the <u>Carcieri</u>

jurisdictional issue,[42] the Court finds – upon a careful review of the briefing – that the historical

arguments advanced in these companion cases do not differ substantially from those deployed in

<u>State v. Salazar</u> and as a result do not alter the Court's analysis.[43]

 Further, the presence of additional arguments alleging misfeasance on the part of

Defendants or the absence of some of the specific claims present in <u>State v. Salazar</u> in no way

changes the necessity of DOI's jurisdiction to any further treatment by the Court and in no way

alters the analysis that leads the Court to conclude that it should not address the merits of these

claims before the jurisdictional inquiry is settled.  That is, the same practical and prudential

concerns that dictate in favor of declining to address the other claims in <u>State v. Salazar</u> on their

merits also instruct the Court to decline to address the merits of the remaining arguments raised

by the other parties in their briefs.

 Similarly, with an eye to such considerations of judicial economy and the desire to

expedite an already lengthy litigation process and also mindful of the incredibly thorough

briefing provided by the parties in <u>State v. Salazar</u>, the Court opts not to restate the extensive

analysis of the <u>Carcieri</u> issue included *supra*.  Instead, the Court concludes that the pending

---

 [42]  <u>See, e.g.</u>, <u>Central NY Fair Business Association et al. v. Salazar et al.</u>, No. 6:08-CV-660
(LEK/DEP), Dkt. Nos. 90-1, 91-1, 97; <u>City of Oneida, New York v. Kempthorne et al.</u>, No.
5:08-CV-00648 (LEK/DEP), Dkt. No. 49-15; <u>Town of Verona et al. v. Salazar et al.</u>, No.
6:08-CV-00647 (LEK/DEP), Dkt. Nos. 43-11, 53.

 [43]  Indeed, given the voluminous exhibits and submissions proffered in <u>State v. Salazar</u> and
the fact that the parties there appear to have provided the Court with a very thorough treatment of
the jurisdictional question, the Court finds it appropriate to focus its analysis of the <u>Carcieri</u> issue
through the lens of those parties arguments.

Motions for summary judgment in the companion cases are denied, without prejudice to renew, for the same reasons stated in the Section on State v. Salazar.

## V.   CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Record of Decision issued on May 20, 2008 for the "Oneida Indian Nation of New York Fee-to-Trust Request" is **REMANDED** to the Bureau of Indian Affairs and the Department of the Interior **for further proceedings consistent with this Memorandum-Decision and Order**;[44] and it is further

**ORDERED**, that in the matter of State of New York, et al. v. Salazar, et al., No. 6:08-CV-00644, Plaintiffs' Motion (Dkt. No. 237) for summary judgment, Defendants' Motion (Dkt. No. 240) for summary judgment, and Defendant-Intervenor OIN's Motion (Dkt. No. 236) are all **DENIED without prejudice, with leave to re-file following further proceedings of DOI consistent with this Memorandum-Decision and Order**.  If the parties choose to re-file, they must do so **within thirty (30) days** of the entry of an amended Record of Decision by DOI; and it is further

**ORDERED**, that in the matter of City of Oneida v. Salazar, et al., No. 5:08-CV-00648, Defendants' Motion (Dkt. No. 45) for summary judgment is **DENIED without prejudice, with**

_____

[44] To allay any possible confusion about what the Court orders and the disposition of the instant Motions, the Court notes that in their briefings, several Plaintiffs in the instant actions suggested that, if the Court were to find that questions persisted as to the Carcieri issue, remand would be appropriate.  Further, the Court notes that the relief requested by most Plaintiffs involves vacating as well as remanding the ROD.  Nevertheless, in deciding to remand the ROD, the Court styles its conclusion as a denial of Plaintiffs' Motions because the Court is not granting any of the requests for summary judgment on the merits.

**leave to re-file following further proceedings of DOI consistent with this Memorandum-Decision and Order**.  If Defendants choose to re-file, they must do so **within thirty (30) days** of the entry of an amended Record of Decision by DOI; and it is further

> **ORDERED**, that in the matter of <u>Upstate Citizens for Equality, Inc., *et al.* v. United States of America, *et al.*</u>, No. 5:08-CV-00633, Defendants' Motion (Dkt. No. 57) for summary judgment and Plaintiffs' Letter Motion (Dkt. No. 58) for summary judgment are **DENIED without prejudice, with leave to re-file following further proceedings of DOI consistent with this Memorandum-Decision and Order**.  If the parties choose to re-file, they must do so **within thirty (30) days** of the entry of an amended Record of Decision by DOI; and it is further

> **ORDERED**, that in the matter of <u>Town of Verona, *et al.* v. Salazar, *et al.*</u>, No. 6:08-CV-00647, Plaintiffs' Motion (Dkt. No. 46) for summary judgment and Defendants' Motion (Dkt. No. 47) for summary judgment are **DENIED without prejudice, with leave to re-file following further proceedings of DOI consistent with this Memorandum-Decision and Order**.  If the parties choose to re-file, they must do so **within thirty (30) days** of the entry of an amended Record of Decision by DOI; and it is further

> **ORDERED**, that in the matter of <u>Central New York Fair Business Association, *et. al.* v. Salazar, *et al.*</u>, No. 6:08-CV-00660, Defendants' Motions (Dkt. Nos. 90, 91) for summary judgment and Plaintiffs' Motion (Dkt. No. 92) for summary judgment are **DENIED without prejudice, with leave to re-file following further proceedings of DOI consistent with this Memorandum-Decision and Order**.  If the parties choose to re-file, they must do so **within thirty (30) days** of the entry of an amended Record of Decision by DOI; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED**.

DATED:          September 24, 2012
                     Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge