UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CENTRAL NEW YORK FAIR
BUSINESS ASSOCIATION; CITIZENS
EQUAL RIGHTS ALLIANCE; DAVID
R. TOWNSEND, New York State
Assemblyman; MICHAEL J. HENNESSY,
Oneida County Legislator; D. CHAD
DAVIS, Oneida County Legislator; and
MELVIN L. PHILLIPS,

                              Plaintiffs,

          -against-                                      6:08-cv-0660 (LEK/DEP)

SALLY M. R. JEWELL,[1] in her official
capacity as Secretary of the U.S.
Department of the Interior; MICHAEL
L. CONNOR, in his official capacity as
Deputy Secretary of the U.S. Department
of the Interior; ELIZABETH J. KLEIN,
in her official capacity as Associate
Deputy Secretary of the Department of
the Interior; CHESTER MCGHEE, in his
official capacity as Eastern Region
Environmental Scientist,

                              Defendants.
_____

**MEMORANDUM-DECISION and ORDER**

_____

     [1] The Court notes inconsistencies in what capacities Defendants were sued.  Compare Dkt.
No. 1 ("Complaint") at 1 (naming only Dirk Kempthorne in his individual and official capacity in
caption) with Compl. ¶ 23 (stating that all parties are sued in their individual and official capacities).
See also Dkt. No. 58 ¶ 22 n.1 (noting substitution of Kenneth L. Salazar for Dirk Kempthorne).
Since Plaintiffs have not made any allegations against Defendants in their individual capacities, the
Court presumes Plaintiffs are only suing Defendants in their official capacities.  See Young Apts.,
Inc. v. Town of Jupiter, 529 F.3d 1027, 1047 (11th Cir. 2008).  Therefore, pursuant to Rule 25(d) of
the Federal Rules of Civil Procedure, Sally M. R. Jewell is substituted as Secretary of the
Department of the Interior, Michael L. Connor is substituted as Deputy Secretary, Elizabeth J. Klein
is substituted as Associate Deputy Secretary, and Chester McGhee is substituted as Eastern
Regional Environmental Scientist.

## I. INTRODUCTION

Plaintiffs Central New York Fair Business Association ("CNYFBA") and Citizens Equal Rights Alliance ("CERA"); David R. Townsend, a New York State Assemblyman; Michael J. Hennessy and D. Chad Davis, both Oneida County legislators; and Melvin L. Phillips (collectively, "Plaintiffs"), commenced this action to challenge a May 20, 2008, Record of Decision issued by Department of the Interior ("DOI") taking over 13,000 acres of land in Central New York into trust for the benefit of the Oneida Indian Nation of New York ("OIN" or the "Nation"). Compl. ¶ 1. Presently before the Court is Defendants' Motion for summary judgment. Dkt. Nos. 114 ("Motion"); 114-1 ("Memorandum"). Plaintiffs filed a Response and Defendants in turn filed a Reply. Dkt. Nos. 119 ("Response"); 122 ("Reply"). For the following reasons, Defendants' Motion is granted.

## II. BACKGROUND

### A. Legal Framework

The Indian Reorganization Act of 1934 ("IRA"), 25 U.S.C. § 461 *et seq*., was the centerpiece of New Deal Indian policy, which sought to enable tribes "to interact with and adapt to modern society as a governmental unit," and repudiated an era in which federal Indian policy had encouraged cultural assimilation. F. Cohen, Handbook of Indian Law § 1.05, at 81 (Newton ed. 2012). The IRA ended allotment, see General Allotment Act of 1887, 24 Stat. 388, where tribal lands had been broken up and distributed to individual Indians, and instead "facilitat[ed] tribes' acquisition of additional acreage and repurchase of former tribal domains," Handbook of Indian Law § 1.05, at 81.

To that end, § 5 of the IRA empowers the Secretary of DOI (the "Secretary") to acquire land

in trust for Indian tribes, such that the land is exempt from state and local taxation.  25 U.S.C. § 465.

A tribe is qualified to have land taken into trust under § 5 if it meet the IRA's definition of "Indian,"

which includes, *inter alia*, "all persons of Indian descent who are members of any recognized tribe

now under Federal jurisdiction."  Id. § 479.  DOI has promulgated regulations at 25 C.F.R. Part 151,

which establish procedures for the acquisition of land in trust under § 5.  These include criteria the

Secretary must consider in making an acquisition, depending on whether the acquisition is on-

reservation, 25 C.F.R. § 151.10, or off-reservation, id. § 151.11.

## B.  Factual Background

"OIN is a federally recognized Indian Tribe and a direct descendant of the Oneida Indian

Nation," that historically occupied what is now central New York, although the tribe's land holdings

and population have fluctuated significantly over time.  City of Sherrill, N.Y. v. Oneida Indian

Nation of N.Y., 544 U.S. 197, 203 (2005).  On April 4, 2005, OIN submitted a request under § 5 of

the IRA to DOI requesting that the Secretary acquire approximately 17,370 acres in Madison

County and Oneida County, New York into trust status for OIN.[2]  Dkt. No. 90-4 ("ROD") at 6.  The

request comprised properties that were reacquired by OIN in open-market transactions, two

centuries after they had last been possessed by the Oneidas.  Id.  The land is the location of OIN's

Turning Stone Resort & Casino ("Turning Stone"), a Class III casino under the Indian Gaming

Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq*.; various other commercial enterprises, such as

gas stations and golf courses; and OIN's government and cultural facilities.  ROD at 6.  OIN intends

to continue existing uses of the land.  See id. at 8, 31.

---

[2] For further background on the history of OIN and the events leading to OIN's fee-to-trust
request, see generally City of Sherrill, 544 U.S. 197.

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*., DOI issued a draft Environmental Impact Statement ("EIS") regarding the proposed fee-to-trust request on November 24, 2006.  ROD at 6.  The purpose of the proposed action was "to help address the Nation's need for cultural and social preservation and expression, political self-determination, self-sufficiency, and economic growth."  Id. at 8.  Public comments were solicited until February 22, 2007, and public hearings were held on December 14, 2006, and February 6, 2008.  Id. at 6-7.  DOI issued its final EIS on February 22, 2008.  Id. at 7.

In the final EIS, DOI analyzed the environmental and socioeconomic impacts of the proposed action—acquiring the full 17,370 acres requested in trust—and eight reasonable alternatives.  Id. at 6-7.  On March 20, 2008, DOI issued its decision to accept approximately 13,003.89 acres in trust for the Nation.  Id. at 7.  The selected alternative "reflects the balance of the current and short-term needs of the Nation to reestablish a sovereign homeland and the New York State and local government requests to establish a more contiguous and compact trust land grouping."  Id. at 19.  Under the selected alternative, 4,284 of the requested acres would not be placed into trust.  Id.  The selected lands are centered around Turning Stone in Oneida County and OIN's 32-acre territory in Madison County.  Id.

### C.  Procedural Background

Plaintiffs commenced this action on June 21, 2008, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq*.; the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202; and 42 U.S.C. §§ 1981, 1983, 1985.[3]  The named Defendants are: Sally M. R. Jewell, United States

---

[3] Several other parties also filed suit challenging the ROD.  State of New York, *et al.* v. Salazar, *et al*., No. 6:08-cv-0644; City of Oneida v. Salazar*, et al.*, No. 5:08-cv-0648; Upstate Citizens for Equality, Inc., *et al*. v. United States, *et al*., No. 5:08-cv-0633; Town of Verona, *et al.* v.

4

Secretary of the Interior; Michael L. Connor, Deputy Secretary of the Interior; Elizabeth J. Klein, Associate Deputy Secretary of the Interior; Chester McGhee, Eastern Regional Environmental Scientist; and Arthur Raymond Halbritter, as "a real party in interest as the Federally Recognized Leader of the Oneida Indian Nation" (collectively, "Defendants"). Compl. ¶ 23.

Plaintiffs' Complaint raises, *inter alia*, the following claims: (1) that § 5 of the IRA violates the non-delegation doctrine as applied to New York, and the Secretary's decision to acquire the land in trust was otherwise unauthorized; (2) the Secretary's acquisition of the land violates the 10th Amendment; (3) the Secretary did not appropriately consider the requisite criteria under 25 C.F.R. § 151; (4) the Secretary did not adequately assess the environmental impacts of the acquisition in accordance with NEPA; (5) the acquisition would interfere with the civil rights of persons of Oneida Indian descent in violation of 42 U.S.C. § 1981; (6) the acquisition constitutes racial discrimination against non-Oneida citizens of Madison and Oneida Counties in violation of 42 U.S.C. § 1983; and (7) the acquisition violates the equal protection rights of non-Indian citizens of New York State in violation of 42 U.S.C. § 1985. See generally Compl.

Defendants moved for partial dismissal of several of Plaintiffs' claims. Dkt. No. 21. Additionally, Defendant Halbritter sought dismissal as a party to the case. Dkt. No. 23. Subsequently, Plaintiffs CNYFBA, CERA, and Hennessy—pursuant to a stipulation and with the Court's approval— submitted an Amended Complaint on May 8, 2009, which challenged a December 30, 2008, decision by the General Services Administration to transfer eighteen acres to DOI to hold in trust for OIN, pursuant to 40 U.S.C. § 523(b)(1). Dkt. No. 58 ("Amended

---

Salazar *et al.*, No. 6:08-cv-0647; and Niagra Mohawk Power Corp. v. Kempthorne, *et al.*, No. 5:08-cv-0649.

Complaint"). Plaintiffs Townsend, Davis, and Phillips have proceeded under the original

Complaint. Defendants filed a Motion to dismiss the claims as they appeared in the Amended

Complaint. Dkt. No. 67.

On March 1, 2010, the Court granted Defendants' Motion for partial dismissal in its entirety,

dismissing Plaintiffs' claims under the Tenth Amendment; the non-delegation doctrine; NEPA; 42

U.S.C. §§ 1981, 1983, 1985; and the IGRA. See generally Dkt. No. 74 ("2010 Memorandum-

Decision and Order"). The Court also granted Defendants' Motion for partial dismissal of claims in

the Amended Complaint, dismissing Plaintiffs' claims pursuant to 42 U.S.C. §§ 1981, 1983, 1985,

and 1986; NEPA; and, the challenge to the December 30, 2008, transfer of eighteen acres into trust.

Id. at 21-24. Finally, the Court dismissed Defendant Halbritter as a party to the action. Id. at 25-26.

On November 15, 2011, Defendants moved for summary judgment on the remaining claims

in Plaintiffs' Complaint and Amended Complaint. Dkt. Nos. 90; 91. The Phillips Plaintiffs also

moved for summary judgment on the first claim in the Complaint. Dkt. No. 92. A newly central

issue raised in the case was whether OIN was eligible to have land taken into trust under the IRA in

light of the Supreme Court's recent decision in Carcieri v. Salazar, 555 U.S. 379 (2009). In

Carcieri, the Supreme Court determined that the word "now" in the definition of "Indian" in the

IRA—"all persons of Indian descent who are members of any recognized Indian tribe now under

Federal jurisdiction"—meant the date of the IRA's enactment in 1934. Carcieri, 555 U.S. at 381.

Thus, to be eligible to have land taken into trust under the IRA, a tribe must have been under federal

jurisdiction in 1934. Since Carcieri had not been addressed in the ROD, the Court issued a

Memorandum-Decision and Order dated September 24, 2012, denying all motions for summary

judgment across the related cases, and remanding to DOI to establish a record and determine in the

first instance whether OIN was under federal jurisdiction in 1934.  Dkt. No. 103.

On February 19, 2014, after the parties had an opportunity to submit evidence for DOI to consider, DOI filed an Amendment to the ROD applying Carcieri to OIN, consistent with the Court's remand.  Dkt. No. 109-1 ("Opinion").  The Opinion concluded that OIN "was under federal jurisdiction in 1934 because the Oneidas voted in an election called and conducted by the Secretary of the Department of the Interior pursuant to Section 18 of the IRA on June 18, 1936." Id. at 3.  The Opinion determined that while the vote alone was sufficient, there were a number of other federal actions which, "either in themselves or taken together," establish that OIN was under federal jurisdiction in 1934. Id.

On March 26, 2014, Defendants again moved for summary judgment on the remaining claims in both the Complaint and Amended Complaint.[4]  Mot.

## III.   LEGAL STANDARD

### A.  Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The movant bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the movant claims will demonstrate the absence of a genuine issue of a material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  If

---

[4] Defendants' Motion for summary judgment addresses both the claims in the Complaint and the Amended Complaint.  Mot. at 1 n.2.  All Plaintiffs are now represented by the same counsel and have filed a single response. See Dkt. No. 112; Resp.

the movant has shown that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to establish a genuine issue of fact by "citing to particular parts of materials in the record." FED. R. CIV. P. 56(c). This requires the non-moving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986).

"The question whether an agency's decision is arbitrary and capricious . . . is a legal issue," and is thus, "amenable to summary disposition." Noroozi v. Napolitano, 905 F. Supp. 2d 535, 541 (S.D.N.Y. 2012) (quoting Citizens Against Casino Gambling in Erie Cnty. v. Stevens, 945 F. Supp. 2d 391, 399 (W.D.N.Y. 2013)). "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." State of Conn. v. U.S. Dep't. of Commerce, No. 04-cv-1271, 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007) (citing Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083-84 (D.C. Cir. 2001)); see also James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1096 (D.C. Cir. 1996) ("Generally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions.").

**B. Administrative Procedure Act**

Under the APA, a district court may set aside an agency's findings, conclusions of law, or actions only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "In reviewing agency action, [a][c]ourt may not 'substitute its judgment for that of the agency.'" Natural Res. Def. Council v. EPA, 658 F.3d 200, 215 (2d Cir. 2011) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). Rather, a reviewing court's task is to determine "whether the [agency's] decision was based on a

consideration of the relevant factors and whether there has been a clear error of judgment." Overton Park, 401 U.S. at 416; see also Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989). Courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Nat'l Ass'n of Homebuilders v. Defenders of Wildlife, 551 U.S. 664, 658 (2007) (internal quotations and citations omitted).

Nevertheless, a reviewing court's "inquiry must be searching and careful." Natural Res. Def. Council, Inc. v. FAA, 564 F.3d 549, 555 (2d Cir. 2009) (internal quotation marks and citations omitted). An agency decision may be deemed arbitrary and capricious if the agency has relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n of U.S., Ind. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); see also Yale New Haven Hosp. v. Leavitt, 470 F.3d 71, 79 (2d Cir. 2006).

Further, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" Natural Res. Def. Council v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting A.L. Pharma, Inc. v. Shalala, 62 F.3d 1484, 1491 (D.C. Cir. 1995)); see also Islander E. Pipeline Co., LLC v. McCarthy, 525 F.3d 141, 151 (2d Cir. 2008) ("This is not to suggest that judicial review of agency action is merely perfunctory. To the contrary, within the prescribed narrow sphere, judicial inquiry must be searching and careful.") (internal quotation marks and citations omitted). In order for an agency's decision to survive judicial review, the agency must have articulated "a rational connection between the facts found and the choice made." Henley v. FDA,

77 F.3d 616, 620 (2d Cir. 1996) (internal quotation marks omitted).

## IV. DISCUSSION

Defendants move for summary judgment on the following claims remaining in Plaintiffs' Complaint and Amended Complaint: (1) a <u>Carcieri</u> claim that OIN was neither federally recognized nor under federal jurisdiction in 1934; (2) a claim that promulgating the fee-to-trust regulations exceeded the Secretary's statutory authority; (3) a claim that the IRA does not apply because OIN voted to reject its application, and because the lands in question were never subject to allotment; and (4) a claim that Defendants did not correctly apply the Part 151 regulations, nor consider the requisite criteria.

### A. <u>Carcieri</u> Claim

#### 1. *Chevron*

A court reviews an agency's interpretation of a statute which it administers under the familiar <u>Chevron</u> framework.  <u>Chevron, U.S.A., Inc. v. Natural Res. Def. Council</u>, 467 U.S. 837, 842-43 (1984).  Under <u>Chevron</u>, a court first asks "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u>  However, if the court determines that "the statute is silent or ambiguous with respect to the specific issue, then the question for the court is whether the agency's answer is based on a permissible construction of the statute."  <u>Id.</u> at 843.

An agency's interpretation only "qualifies for <u>Chevron</u> deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law and that the agency interpretation claiming deference was promulgated in the exercise of that authority."

Rotimi v. Gonzales, 473 F.3d 55, 57 (2d Cir. 2007) (per curiam) (quoting United States v. Mead Corp., 533 U.S. 218, 226-27 (2001)) (internal quotation marks omitted). An interpretation contained in a format such as an opinion letter or policy statement lacks the force of law and does not warrant Chevron deference. Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y., 273 F.3d 481, 490 (2d Cir. 2001) (citing Christensen v. Harris Cnty., 529 U.S. 576, 587 (2000)). An interpretation advanced in a format such as an opinion letter is nonetheless "'entitled to respect' . . . to the extent that [it has] the 'power to persuade.'" Christensen, 529 U.S. at 587; Skidmore v. Swift & Co., 323 U.S. 134 (1944).

Defendants argue that Chevron provides the appropriate framework with which to review the Secretary's Carcieri Opinion. Mem. at 14-16. Alternatively, Defendants argue that if the Court finds Chevron inapplicable, it should apply Skidmore deference. Mem. at 16 n.9.

The Secretary is delegated broad authority over Indian affairs. See 43 U.S.C. § 1457; see also 25 U.S.C. § 9 ("The President may prescribe such regulations as he may think fit for carrying into effect the various provisions of any act relating to Indian affairs."). To determine whether the Court analyzes the Secretary's interpretations of "under federal jurisdiction" and "recognized Indian tribe" under Chevron or under Skidmore, the Court must examine whether those interpretations were promulgated with "the force of law." Mead, 533 U.S. at 227. The Secretary promulgated the interpretation in question in a Record of Decision acquiring land in trust on behalf of the Cowlitz tribe. See Op. at 4 n.22 (citing Record of Decision, Trust Acquisition of, and Reservation Proclamation for the 151.87-acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe (April 22, 2013)). However, the fact that an interpretation is reached in a format less formal than notice and comment rulemaking, "does not automatically deprive that interpretation of

the judicial deference otherwise its due." Barnhart v. Walton, 535 U.S. 212, 222 (2002). DOI reached the interpretation here through a process that involved extensive opportunities for public participation and resulted in a reasoned analysis of the statutory issue. Given "the interstitial nature of the legal question [and] the related expertise of the Agency," the Court finds that Chevron provides the appropriate standard under which to review interpretations in the Secretary's Carcieri Opinion. Barnhart, 535 U.S. at 223; Cal. Valley Miwok Tribe v. United States, 525 F.3d 1262, 1267 (D.C. Cir. 2008); see also Confederated Tribes of the Grand Rondee Cmty. v. Jewell, No. 13-849, 2014 WL 7012707, at *4 (D.D.C. Dec. 12, 2014) (applying Chevron deference to Secretary's interpretation of "under Federal jurisdiction").

### 2. The Secretary's Interpretation of "under Federal jurisdiction"

The Court, therefore, reviews the Secretary's interpretation of "under federal jurisdiction" under the framework provided by Chevron. The Secretary determined that "under federal jurisdiction" was not defined under the IRA, nor clarified by the legislative history, and was therefore ambiguous. Op. at 4. Considering the text of the IRA, its remedial purposes and legislative history, the background principles of Indian law, and the Indian canons of construction, the Secretary then construed the phrase as entailing a two-part inquiry. Id. at 5. First, "whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under federal jurisdiction." Id. Specifically, the inquiry considers whether the United States had "taken an action or series of actions," "for or on behalf of the tribe or in some instances, tribal members," that reflect "federal obligations, duties, responsibility for or authority over the tribe." Id. at 5-6. The second part of the inquiry examines "whether the tribe's jurisdictional status remained intact in 1934." Id. at 6.

Under <u>Chevron</u>'s first step, the Court must determine whether, employing the "traditional tools of statutory construction," the phrase "under federal jurisdiction" is ambiguous. <u>Chevron</u>, 467 U.S. at 843 n.9. Plaintiffs argue that the Supreme Court determined in <u>Carcieri</u> that "now under federal jurisdiction" was not ambiguous. Resp. at 8. However, the Supreme Court only determined that the word "now" was unambiguous; the issue of whether the Narragansett Tribe was under federal jurisdiction in 1934 was conceded and therefore unaddressed by the Court. <u>Carcieri</u>, 555 U.S. at 395. Thus, contrary to Plaintiffs' contention, <u>Carcieri</u> left the meaning of "under Federal jurisdiction" an open question. <u>See id.</u> at 401 (Souter, J., Concurring) ("The very notion of jurisdiction as a distinct statutory condition was ignored in this litigation, and I know of no body of precedent or history of practice giving content to the condition.").

The Court finds that the language of the phrase does not point to a single unambiguous meaning. Assuming that the phrase does not refer to the federal government's broad constitutional authority over Indian tribes, it is nonetheless unclear what government actions would bring a tribe "under Federal jurisdiction." <u>See</u> <u>Grand Rondee</u>, 2014 WL 7012707, at *10. The legislative history shows that the phrase was added to narrow which tribes would qualify for benefits under the IRA; however, there is no discussion of the phrase's meaning. <u>See</u> AR011718-21.[5] Assistant Solicitor of DOI Felix Cohen, one of the primary drafters of the initial proposed legislation, acknowledged its inclusion in the Senate bill, "whatever [it] may mean." AR011721.

Having found that "under Federal jurisdiction" is ambiguous, the Court must next determine whether the Secretary's two-part test is a permissible construction of the statute. <u>Chevron</u>, 467 U.S.

_____

[5] The administrative record supporting the Opinion was filed with the Court on disks. <u>See</u> Dkt. No. 106.

at 843; <u>Cohen v. JP Morgan Chase & Co.</u>, 498 F.3d 111, 125 (2d Cir. 2007). The Court finds that

the Secretary's interpretation is well-reasoned and properly draws on BIA's expertise with Indian

affairs. The Secretary's interpretation is based on the background principles of Indian law, the

history of relations between the United States and tribes, the purpose of the IRA, and the Indian

canons of construction. Op. at 4-5. Specifically, the Secretary considered the "broad general

powers" the Constitution grants Congress with respect to Indian tribes, and the powers in the Indian

Commerce Clause and the Treaty Clause. <u>Id.</u> at 4. The Secretary further considered the history of

relations between the United States and the tribes and how as a result of that history, long unbroken

practices "have attributed to the United States . . . the power and duty of exercising a fostering care

and protection over all dependent Indian communities." <u>Id.</u> at 5. The Secretary's two-part test

therefore aims to evaluate on a case-by-case basis the dealings between the United States and a

tribe.

### 3. *DOI's Application of the Two-Part Test to OIN*

The Court must next review DOI's application of the two-part test to OIN under the APA

arbitrary and capricious standard. Applying the two-part test, DOI determined that the Oneidas

were under federal jurisdiction in 1934. Op. at 6. DOI found that the fact that the Oneidas voted in

a special election called pursuant to § 18 of the IRA in 1936 conclusively establishes that OIN was

under federal jurisdiction in 1934. <u>Id.</u> at 7. Although DOI found the IRA vote dispositive, it found

that a number of other interactions between the United States and the Oneidas would also

conclusively establish, "either by themselves or collectively," that OIN was under federal

jurisdiction in 1934. <u>Id.</u> at 15. These interactions include the 1794 Treaty of Canandaigua, 7 Stat.

44, between the United States and Oneidas, and a suit the United States brought as trustee to the

14

Oneidas in 1915 in <u>United States v. Boylan</u>, 265 F. 165 (2d Cir. 1920). <u>Id.</u> at 16-17.

Plaintiffs make the following arguments against DOI's determination that the Oneidas were under Federal jurisdiction in 1934: (1) the Oneidas have continuously been under State jurisdiction since the 1788 Treaty of Fort Schuyler; (2) any Federal jurisdiction over the Oneidas was relinquished with the Removal Act of 1830 ("Removal Act"), 4 Stat. 411, and the 1838 Treaty of Buffalo Creek, 7 Stat. 550; (3) <u>Boylan</u> only involved the government providing assistance to individual Indians; and (4) the § 18 IRA votes had no significance to whether or not a tribe was under Federal jurisdiction. <u>See</u> Resp. at 17-24.

### a. Treaty of Fort Schulyer and Treaty of Canandaigua

"In 1788, the Oneida ceded most of their land to the State of New York in the Treaty of Fort Schulyer, retaining a reservation of approximately 300,000 acres." Op. at 16. In 1794, the United States entered into the Treaty of Canandaigua with the Six Iroquois Nations and "acknowledge[d] the lands reserved to the Oneida, Onondaga and Cayuga Nations, in their respective treaties with the State of New York, and called their reservations, to be their property." <u>Id.</u> (quoting Treaty of Canandaigua). Plaintiffs claim that the Oneida reservation remained a State reservation after the Federal acknowledgment in the Treaty of Canandaigua. Resp. at 17-18. Thus, Plaintiffs claim the Oneidas were under "the primary jurisdiction of the State of New York as a state tribe." <u>Id.</u> at 18.

Plaintiffs' argument fails because the Supreme Court determined in <u>Oneida Indian Nation of N.Y. v. Oneida Cnty., N.Y.</u>, 414 U.S. 661 (1974) ("<u>Oneida II</u>"), that "[o]nce the United States was organized and the Constitution adopted, . . . tribal rights [of occupancy] to Indian lands became the exclusive province of the federal law." <u>Id.</u> at 667. "The Federal Government took early steps to deal with the Indians through treaty, the principal purpose often being to recognize and guarantee

the rights of Indians to specified areas of land.  This the United States did with respect to the various

New York Indian Tribes, including the Oneidas."  Id.  Thus, it follows from Oneida II that the land

"acknowledged" as "reserved to the Oneida" in the Treaty of Canandaigua was under the

jurisdiction of federal law, and not state law.  See id. at 670-71 (citing Worcester v. Georgia, 6 Pet.

525, 560 (1832) (stating "universal conviction" that Indian tribes "possessed rights with which no

state could interfere: and that the whole power of regulating the intercourse with them, was vested

in the United States").

The exclusive federal jurisdiction over tribal rights of occupancy applies even where "the

United States never held fee title to the Indian lands"—as in the original colonies—and the fee title

to Indian lands is accordingly in the state.[6]  Id. at 670 (citing Fletcher v. Peck, 6 Cranch 87 (1810)).

Although New York may have once also possessed sovereign rights with respect to Indian lands

within its borders under the Articles of Confederation, such rights "were ceded by the State to the

federal government by the State's ratification of the Constitution."  Oneida Indian Nation of N.Y. v.

N.Y., 194 F. Supp. 2d 104 (N.D.N.Y. 2002) (Kahn, J.) (quoting Cayuga Indian Nation of New York

v. Cuomo, 758 F. Supp. 107, 116 (N.D.N.Y. 1991)).

b. Removal Act of 1930 and Treaty of Buffalo Creek

Plaintiffs claim that any federal jurisdiction over the Oneidas was extinguished by the

Removal Act and the Treaty of Buffalo Creek.  Plaintiffs' claims fail because it remains the law in

---

[6] In the context of Indian lands, fee title and the Indian right of occupancy relate to different concepts.  Oneida Indian Nation of N.Y. v. State of N.Y., 691 F.2d 1070, 1075 (2d Cir. 1982). "[P]ossession is governed by the concept of Indian title, which recognizes the Indians as 'the rightful occupants of the soil.'"  Id.  Fee title, on the other hand, is a "preemptive right over all others to purchase the Indian title," which is only perfected if the "Indian title is extinguished by sovereign act."  Id.

the Second Circuit that "the Oneidas' reservation was not disestablished." Oneida Indian Nation of N.Y. v. Madison Cnty., 665 F.3d 408, 443 (2d Cir. 2011) (quoting Oneida Indian Nation of N.Y. v. City of Sherrill, N.Y., 337 F.3d 139, 167 (2d Cir. 2003) ("Sherrill II")). An Indian reservation is disestablished or diminished only where there is "substantial and compelling evidence" of congressional intent to do so. Solem v. Bartlett, 465 U.S. 463, 472 (1984). The Sherrill II Court found that the Treaty of Buffalo Creek did not evince a clear congressional intent to disestablish or diminish the Oneida reservation. 337 F.3d at 165.

### c. United States v. Boylan

DOI cites United States v. Boylan as evidence that the Oneidas were under federal jurisdiction. Op. at 17-18. In Boylan, the United States instituted an action in ejectment on behalf of "certain Oneida Indians." 265 F. 165. Plaintiffs claim that Boylan merely involves the government providing assistance to "individual Oneida Indians," and does not signify any particular jurisdictional relationship with the Oneida tribe. Resp. at 20. Contrary to Plaintiffs' assertion, the Boylan Court held that the Oneidas were a "separate band or tribe," and that the United States had capacity to maintain the action on account of its relationship to the tribe. 265 F. at 171. Thus, Boylan did not merely constitute "individual assistance," as Plaintiffs claim, Resp. at 20, and is evidence that the Oneidas were under federal jurisdiction, Op. at 18.

### d. Section 18 IRA Vote

Plaintiffs argue that evidence concerning other § 18 votes contradicts DOI's conclusion that the act of holding a vote conclusively establishes that the Oneidas were under federal jurisdiction. Resp. at 23; id., Exs. 2-6. Specifically, Plaintiffs claim that DOI called votes for six Rancheria tribes in California, where no voters appeared for the election. Id. Furthermore, certain

17

Indian groups voted to accept the IRA, but were later denied benefits when DOI decided to not allow any group under fifty members to organize under the IRA. Id. Thus, Plaintiffs argue that "[b]eing allowed to vote on the IRA referendum meant nothing." Id.

Defendants argue that Plaintiffs are precluded from raising their § 18 arguments because they did not present them when DOI invited comments during the remand. Reply at 9-10. Plaintiffs did participate in the administrative process, but did not submit the evidence now offered. Id. Defendants rely on the general principle that "[p]ersons challenging an agency's [action] 'must structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 764 (2004) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 553 (1978)). Thus, courts have barred parties from making arguments that were not first presented to the agency. Appalachian Power Co. v. EPA, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("It is black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue.") (internal quotation marks omitted). This requirement may be waived if a court finds that it would be justified under the circumstances—for example, if the issue was raised by a third-party or was otherwise considered by the agency. See Natural Res. Def. Council, Inc. v. EPA, 824 F.2d 1146, 1151 (D.C. Cir. 1987). The Court finds that there are no special circumstances that would warrant consideration of the arguments now raised by Plaintiffs. Plaintiffs offered comments on the Secretary's Opinion, but elected not to offer the evidence now presented. See Op. at 40. Nor did DOI otherwise consider this evidence. Reply at 9-10.

*4. The Secretary's Interpretation of "recognized Indian tribe"*

The Court must also review the Secretary's construction of the phrase "recognized Indian tribe." Op. at 30-32. DOI determined that the "[t]he word 'now' in the IRA only modifies the phrase 'under federal jurisdiction,' and is not related to the phrase 'any recognized Indian tribe.'" Id. at 30. Therefore, a tribe need only be "recognized" at the time DOI acquires the land in trust. Id. at 31. Plaintiffs do not appear to challenge DOI's interpretation of "recognized." To the extent, however, that Plaintiffs do challenge DOI's interpretation, see, e.g., Am. Compl. ¶ 127, the Court finds that challenge to be without merit. The Court believes that the language of the statute is plain enough to arguably mandate DOI's reading at Chevron step one, since "any recognized Indian tribe" precedes the word "now." However, assuming *arguendo*, that the phrase is ambiguous, the Court also finds that DOI's interpretation is reasonable at Chevron step two. See Carcieri, 555 U.S. at 398 (Breyer, J., Concurring) ("The statute, after all, imposes no time limit upon recognition."); see also Grand Rondee, 2014 WL 7012707, at *5-9 (finding that "recognized" does not unambiguously refer to recognition as of 1934 and that Secretary's interpretation is reasonable.).

*5. Secretary's Determination that OIN is a "recognized Indian tribe"*

Although DOI's interpretation places no time limit upon recognition, the Court must also review DOI's conclusion that OIN is a "recognized Indian tribe." Op. at 31. Plaintiffs argue that OIN has never been formally recognized under the regulations at 25 C.F.R. § 83. Resp. at 21-22. Plaintiffs' argument again raises a question of the meaning of "recognition." Plaintiffs assume that recognition can only mean "formal recognition" under the § 83 regulations. Id. at 21. DOI, on the other hand, concluded that recognition can mean either "in a 'cognitive' or 'quasi-anthropological' sense—i.e., the fact of tribal existence; or it could mean in a more 'formal' or 'jurisdictional'

19

sense—i.e., as in a federally recognized tribe." Mem. at 22. DOI assumes that recognition is not limited to the modern definition in the § 83 regulations, but rather can be demonstrated by a range of federal actions. Op. at 31. Thus, DOI found that "the Oneida have been recognized since at least 1794, as demonstrated by the series of treaties and treaty negotiations between the Oneida and the United States up to 1868." Id.

Having found *supra*, that DOI's interpretation that there is no time limit upon recognition is reasonable, the Court agrees that recognition is not limited to the mechanism in the § 83 regulations, and that DOI's interpretation of recognition as entailing a cognitive and a formal sense is reasonable. Accordingly, the Court agrees that the same evidence that establishes that OIN was under federal jurisdiction in 1934, also demonstrates that OIN is a federally recognized tribe.

### 6. *Summary*

In summary, the Court defers to the Secretary's interpretations of "under federal jurisdiction" and "recognized Indian tribe" under Chevron. The Court also finds that the Secretary's conclusions that OIN is a "recognized Indian tribe" and was "under federal jurisdiction" in 1934 are reasonable and supported by the record. Accordingly, summary judgment is granted in favor of Defendants on Plaintiffs' Carcieri claim.

### B. Secretary's Authority to Remove Lands From State Jurisdiction

Relying on Hawaii v. Office of Hawaiian Affairs, 556 U.S. 163 (2009), Plaintiffs argue that the Part 151 regulations are *ultra vires* because the Secretary does not have the authority to "withdraw lands from state jurisdiction by placing those lands into trust status." Resp. at 24; Am.

Compl. ¶¶ 144-48.[7]  Plaintiffs claim that DOI has interpreted the fee-to-trust mechanism to create a "permanently reserved federal public domain."  Resp. at 28.

The Court finds that <u>Hawaii</u> is inapplicable to an IRA trust acquisition.  In <u>Hawaii</u>, the Supreme Court held that a congressional Apology Resolution did not limit Hawaii's authority to sell land that was ceded to the State when it was admitted to the United States.  556 U.S. at 172.  In reaching this holding, the Court noted that interpreting the Apology Resolution to "'cloud' Hawaii's title to its sovereign lands" would create "grave constitutional concerns."  <u>Id.</u> at 176 (citing <u>Idaho v. United States</u>, 533 U.S. 262, 280, n.9 (2001) ("Congress cannot, after statehood, reserve or convey submerged lands that have already been bestowed upon a State.")).  Plaintiffs' argument fails because an IRA trust acquisition does not remove the acquired land from all aspects of state jurisdiction, and therefore does not negate state authority so as to raise the federalism concerns found by the <u>Hawaii</u> Court.  <u>Nevada v. Hicks</u>, 533 U.S. 353, 362 (2001) ("State sovereignty does not end at a reservation's border.").  Thus, the IRA fee-to-trust provision does not, as Plaintiffs claim, unconstitutionally assert plenary federal and tribal authority in place of State jurisdiction, and summary judgment on this claim is accordingly granted in favor of Defendants.  <u>See</u> <u>New Mexico v. Mescalero Apache Tribe</u>, 462 U.S. 324, 331-32 (1983).

In a related argument, Plaintiffs seem to claim that the Secretary's trust acquisition exceeds her authority by carving "out OIN land from the jurisdiction of the State of New York," and "asserting the authority to create a federal Indian reservation in New York where no federal Indian reservation has ever existed."  Compl. ¶¶ 83, 86.  With respect to that argument, the Court notes that

_____

[7] Plaintiffs argue in their Response that lands may only be acquired in trust under § 5 where Congress has made a specific appropriation.  Resp. at 26.  The Court earlier rejected this argument in the context of Plaintiffs' non-delegation claim.  2010 MDO at 11.

DOI's trust acquisition does not, as Plaintiffs claim, create a federal Indian reservation. As the Court has repeatedly observed, it remains the law in the Second Circuit that the Oneida reservation has not been disestablished. Oneida Indian Nation, 665 F.3d at 443. Thus, Plaintiffs' argument that the Secretary has exceeded her authority by creating an Indian reservation fails.

### C. Section Eighteen Vote and Allotment

Plaintiffs summarily assert that the IRA does not apply to OIN because: (1) OIN voted in 1936 to reject the application of the Act under § 18, and (2) the IRA only applies to lands that were subject to allotment. Compl. ¶¶ 88-90. The first argument fails because Congress in the Indian Land Consolidation Act ("ILCA"), 96 Stat. 2517, extended the benefits of the IRA to tribes that had initially opted out of the Act by a § 18 vote. Section 2202 provides that "[t]he provisions of section 465 of this title shall apply to all tribes notwithstanding the provisions of section 478 of this title." 25 U.S.C. § 2202. In a related argument, Plaintiffs appear to claim that the Supreme Court in Carcieri held that the ILCA only extends the benefits of the IRA to "those tribes who were originally eligible to vote on the IRA" and that the Oneidas were not among the tribes that were originally eligible. See Am. Compl. ¶¶ 121, 127. However, Carcieri in fact states that "§ 2202 provides additional protections to those who satisfied the definition of 'Indian' in § 479." 555 U.S. at 395. DOI has determined that OIN satisfies that definition, which does not turn on original eligibility to vote. The Court has already rejected the argument that the IRA is limited to lands that were subject to allotment in related cases and does so again here. City of Oneida, N.Y. v. Salazar, No. 08-cv-0648, 2009 WL 3055274, at *5 (N.D.N.Y. Sept. 21, 2009) (Kahn, J.).

### D. On-Reservation and Off-Reservation Regulations

Plaintiffs claim that DOI incorrectly applied the on-reservation regulations, rather than the

stricter off-reservation regulations. Compl. ¶ 111. The off-reservation regulations require the Secretary to give "greater scrutiny to the tribe's justification of anticipated benefits," and "greater weight" to the jurisdictional concerns of local governments. 25 C.F.R. § 151.11(b).

An acquisition is on-reservation when "the tribe is recognized by the United States as having governmental jurisdiction" over the area of land. 25 C.F.R. § 151.2(f). Plaintiffs argue that it follows from the Supreme Court's holding in <u>City of Sherrill</u> that the lands in question "are not considered reservation lands for purposes of sovereignty." Compl. ¶ 111. The Court in <u>City of Sherrill</u>, however, clearly distinguished between questions of right and questions of remedy; its holding was that equitable considerations bar OIN from reasserting sovereign control. <u>See</u> <u>City of Sherrill</u>, 544 U.S. at 213-14. The <u>City of Sherrill</u> Court reserved judgment on whether the Oneidas' reservation still exists, 544 U.S. at 215 n.9, and as the Court has acknowledged, it remains the law in the Second Circuit that the OIN reservation has not been disestablished, <u>see</u> <u>Oneida Indian Nation</u>, 665 F.3d at 443. Thus, the United States does recognize OIN as having governmental jurisdiction over the land in question and accordingly, DOI correctly applied the on-reservation regulations.

### E. DOI's Application of IRA Regulations

Plaintiffs summarily assert that DOI has failed to consider the requisite criteria under 25 C.F.R. § 151.10. Compl. ¶¶ 79, 114-17; Am. Compl. ¶¶ 142-43. Specifically, Plaintiffs state that DOI did not consider: (1) the jurisdictional impacts of the acquisition, Compl. 79; Am. Compl. ¶ 143; (2) the impact on local governments from the removal of land from the tax rolls, Am. Compl. ¶ 142; (3) the need for the land to be put into trust, Compl. 114; Am. Compl. ¶ 142; (4) and the unfair competitive advantage that OIN businesses will gain over non-OIN businesses, Compl. ¶ 117.

Plaintiffs also claim that the ROD failed to adequately consider "viable alternatives." Compl. ¶ 116.

First, Defendants argue that the Court has already determined that Plaintiffs lack standing to bring NEPA claims, and therefore, lack standing on these claims, which allege deficiencies in the final EIS and ROD. Mem. at 29. The Court's March 2010 MDO held that Plaintiffs did not have standing on their fourth claim of relief—which alleged that DOI's determination was arbitrary and capricious because it failed to adequately assess environmental impacts under NEPA—because they had not alleged any environmental injury. 2010 MDO at 17-20. The Court agrees with Defendants that insofar as other NEPA claims are scattered throughout Plaintiffs' Complaint, Plaintiffs also lack standing on those claims. Plaintiffs' claim that DOI failed to consider viable alternatives is a NEPA claim, and therefore among the claims that the Court earlier dismissed.

The Court, however, disagrees that Plaintiffs' other claims are NEPA claims. Plaintiffs' other claims arise under § 151.10; in each case, Plaintiffs claim that DOI's determination was arbitrary and capricious because it failed to adequately consider the applicable criteria. Thus, these claims do not fall within the Court's earlier holding dismissing Plaintiffs' NEPA claims.

The Court must therefore consider whether DOI has considered the § 151.10 factors and drawn a "rational connection between the facts found and the choice made." State Farm, 463 U.S. at 42-43. The Court notes that "[t]he burden is on the plaintiff to prove that the agency's action was arbitrary and capricious," and that to meet that burden, a plaintiff "must present evidence that the agency did not consider a particular factor; it may not simply point to the end result and argue generally that it is incorrect" South Dakota v. U.S. Dep't of Interior, 423 F.3d 790, 800 (8th Cir. 2005).

*1. Jurisdictional Impacts*

Section 151.10(f) requires the Secretary to consider "jurisdictional problems and potential conflicts of land use which may arise." 25 C.F.R. § 151.10(f). DOI received comments from the State and local governments expressing concern about "impacts to the environment, public health and safety, and zoning/land use planning following replacement of State and local jurisdiction with tribal jurisdiction." ROD at 55. The State and local governments also expressed concern that the trust acquisition would create a "checkerboard" jurisdiction, which would complicate uniform and equitable application of laws. Id.

The ROD sufficiently addresses these concerns. The selected alternative was intended to minimize jurisdictional impacts by acquiring lands in "two highly contiguous clusters." Id. at 56. DOI also found that OIN's past management of its lands indicated that jurisdictional impacts were unlikely to be significant. Id. at 21. OIN has entered into agreements with local governments to share the cost of services, which "display[s] the Nation's willingness and ability to cooperate." Id. at 57-59. DOI also noted that OIN's land uses are generally consistent—with the exception of Turning Stone—with local zoning. Id. at 59. Finally, trust lands will be subject to OIN and federal law. Id. at 66-67.

In light of this discussion, the Court finds that DOI has adequately considered Plaintiffs' jurisdictional concerns and rationally evaluated such concerns. See Cnty. of Charles Mix v. U.S. Dep't of Interior, 799 F. Supp. 2d 1027, 1046 (D.S.D. 2011) ("[DOI] fulfills its obligation under Section 151.10(f) as long as it 'undertake[s] an evaluation of potential problems.'") (quoting South Dakota v. U.S. Dep't of Interior, 314 F. Supp. 2d 935, 945 (D.S.D. 2004)). Plaintiffs have only asserted in a conclusory manner that DOI did not adequately consider jurisdictional impacts, and

therefore have not met their burden of proof.

### 2. *Impact on Local Tax Rolls*

Section 151.10(e) requires the Secretary to consider "the impact on the State and its political

subdivisions resulting from the removal of the land from the tax rolls." 25 C.F.R. § 151.10(e). The

State and local governments opposed the trust acquisition "based on asserted loss of tax revenues."

ROD at 40.

DOI thoroughly analyzed the impact of the trust acquisition on the tax rolls of each affected

jurisdiction. Id. at 40-55. While finding that § 151.10(e) only required analysis of tax impacts

"based on existing circumstances, i.e., taxes actually assessed and paid," and did not require

speculation "on the outcome of the pending litigation between the Nation and the Counties over

taxes," id. at 41, DOI also evaluated the tax impacts in the event that the Counties prevail in that tax

litigation, id. at 45. Defendants concluded that, "based on taxes actually assessed and paid," the

benefits of the acquisition to OIN outweighed the tax impacts on local governments. Id. at 50.

Defendants' analysis further balanced lost tax revenue against the economic and tax benefits

produced by OIN's business activities, and found that the net economic impact on almost every

jurisdiction was positive, even assuming, *arguendo*, that OIN does not prevail in the ongoing tax

litigation. Id. at 49-50. Considering the foregoing, Defendants ultimately concluded that the impact

of removing the land from the tax rolls was not significant when balanced with the benefits to OIN.

Id. at 50.

The Court finds that this discussion is sufficient to meet DOI's obligationto consider the

impact on local tax rolls under § 151.10(e). See South Dakota v. U.S. Dep't of Interior, 401 F.

Supp. 2d 1000, 1008-09 (D.S.D. 2005) (finding that DOI adequately considered impact of trust

acquisition on tax rolls and reached a rational decision). Plaintiffs have not pointed to any specific

flaws in DOI's analysis and therefore have not met their burden of proof.

### 3. Need for the Trust Acquisition

Under § 151.10(b), the Secretary is required to consider "[t]he need of the individual Indian

or the tribe for additional land." 25 C.F.R. § 151.10(b). State and local governments commented

that OIN is a financially secure tribe and would therefore have its needs met by continuing as a

private landowner. ROD at 36. DOI weighed these comments, but observed that "a demonstration

of necessity may take into account more than economic need." Id. DOI determined that acquiring

the land in trust was important because of the antagonistic relationship between OIN and State and

local governments; DOI concluded that so long as OIN is a private landowner, it will continue to

face litigation. Id. Acquiring the land in trust would enable OIN to continue existing uses of its

lands, and thereby promote tribal self-determination and economic development; it would help

"address the Nation's current and near term needs to permanently reestablish a sovereign homeland

for its members." Id.

The Court finds that DOI reasonably weighed OIN's need for the land to be held in trust.

See South Dakota v. U.S. Dep't of Interior, 423 F.3d at 801 ("It [is] sufficient for the Department's

analysis to express the Tribe's needs and conclude generally that the IRA purposes were served.").

Plaintiffs again have not made anything other than a conclusory assertion and therefore have not met

their burden.

### 4. Competitive Disadvantage for Non-Indian Businesses

Plaintiffs assert that the trust acquisition will grant OIN an unfair advantage in being able to

operate businesses in direct competition with non-Indian businesses, without being subject to State

and local laws.  Compl. ¶ 117.  Plaintiffs fail to state a legally cognizable claim because they are

effectively objecting to the fee-to-trust mechanism that Congress established in the IRA to promote

tribal self-governance, and not to Defendants' decision in the ROD.  Furthermore, Plaintiffs ignore

Defendants' discussion of this concern, which notes that "[p]lacement of the lands into trust would

not prevent the State from enforcing lawfully applicable sales and excise taxes if in the future it

determines to do so."  <u>See</u> ROD at 24-25.  Thus, to the extent that tribal businesses do enjoy a

competitive advantage, it is for the State to decide whether to apply sales and excise taxes to tribal

businesses.

5. *Summary*

In summary, because Plaintiffs have only made conclusory allegations against DOI's

analysis, the Court finds that DOI's determination to accept the land into trust was not arbitrary and

capricious.  The Record demonstrates that Defendants reached a reasonable decision that took

account of the applicable regulatory factors.  Moreover, Defendants considered and responded to

objections raised by Plaintiffs.  Accordingly, summary judgment is granted on Plaintiffs' claims that

DOI was arbitrary and capricious in failing to adequately consider the applicable statutory criteria.

**V.    CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 114) for summary judgment on all

remaining claims is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     March 26, 2015
           Albany, NY

Lawrence E. Kahn
U.S. District Judge